**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION**

| | |
|---|---|
| ALEXIS DEGIDIO, on behalf of herself and all others similarly situated, | ) ) ) |
| Plaintiff, | ) Civil Action No.: 4:13-cv-02136 ) |
| v. | ) Judge Bruce Howe Hendricks ) |
| CRAZY HORSE SALOOON AND RESTAURANT, INC. d/b/a THEE NEW DOLLHOUSE, | ) Electronically Filed ) ) ) |
| Defendant. | ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
CONDITIONAL COLLECTIVE ACTION CERTIFICATION AND JUDICIAL
NOTICE PURSUANT TO SECTION 216(b) OF THE FAIR LABOR STANDARDS ACT**

## I.    PRELIMINARY STATEMENT

This Court has long recognized the propriety of authorizing judicial notice in collective actions brought under the Fair Labor Standards Act ("FLSA"), 28 U.S.C. §§ 201, *et. seq.  See, e.g., Benbow v. Gold Kist, Inc.*, No. 06-02751, 2007 WL 7595027 (D.S.C. Apr. 16, 2007). Consistent with this recognition, the United States Supreme Court has held that, to serve the "broad remedial purpose" of the FLSA and further the "wisdom and necessity for early judicial intervention," courts have the discretion to manage the notice process to give prospective collective action members an opportunity to join.  *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 171–73 (1989).

This case involves only one job position — entertainers — working in a single business location, performing the same job duties, and subject to the same unlawful policies of misclassification and denial of wages.  Named Plaintiff Alexis DeGidio and opt-in plaintiffs

1

Jacinda Gardner and Dawn Ungaro (collectively, "Plaintiffs") seek conditional collective action certification for the purpose of providing notice to putative opt-in plaintiffs pursuant to Section 216(b) of the FLSA. Specifically, Plaintiffs make this motion for conditional certification of, and notice dissemination to, all entertainers who worked for Defendant as entertainers from March 1, 2012 to the present at its single facility located in North Myrtle Beach, South Carolina. In order to facilitate such notice, Plaintiffs further seek production by Defendant of an electronic list of all putative opt-in plaintiffs, including such individuals' most recent contact and identifying information.

The standard Plaintiffs must meet to achieve conditional certification and court-facilitated notice is fairly lenient under the FLSA: Plaintiffs need only demonstrate that they are "similarly situated" to the potential plaintiffs with a "modest factual showing" that Plaintiffs and potential opt-in plaintiffs together were victims of a common policy or plan that violated the law. *Regan v. City of Charleston, S.C.*, No. 13-3046, 2014 WL 3530135 (D.S.C. July 16, 2014), reconsideration denied, No. 13-3046, 2014 WL 4215871 (D.S.C. Aug. 18, 2014); *Visco v. Aiken Cnty., S.C.*, 974 F.Supp.2d 908, 915 (D.S.C. 2013); *Steinberg v. TQ Logistics, Inc.*, No. 10-2507, 2011 WL 1335191 (D.S.C. Apr. 7, 2011). Since *Hoffmann-La Roche*, courts sitting within the Fourth Circuit have routinely granted judicial notice in FLSA collective actions.[1] These Courts have consistently held that the merits of plaintiffs' claims are irrelevant at this stage.[2]

---

[1] *See, e.g.*, *Amrhein v. Regency Mgmt. Servs., LLC*, No. 13-1114, 2014 WL 1155356 (D. Md. Mar. 20, 2014); *Randolph v. PowerComm Const., Inc.*, No. 13-1696, 2014 WL 1260722 (D. Md. Mar. 25, 2014); *Ruiz v. Monterey of Lusby, Inc.*, No. 13-3792, 2014 WL 1793786 (D. Md. May 5, 2014); *Regan v. City of Charleston, S.C.*, No. 13-3046, 2014 WL 3530135 (D.S.C. July 16, 2014); *MacGregor v. Farmers Ins. Exch.*, No. 10-03088, 2012 WL 2974679 (D.S.C. July 20, 2012); *Benbow v. Gold Kist, Inc.*, No. 06-02751, 2007 WL 7595027 (D.S.C. Apr. 16, 2007).

[2] *See, e.g.*, *Long v. CPI Sec. Sys., Inc.*, 292 F.R.D. 296, 303 (W.D.N.C. 2013), motion to certify appeal denied, No. 12-396, 2013 WL 3761078 (W.D.N.C. July 16, 2013); *LaFleur v. Dollar Tree Stores, Inc.*, No. 12-00363, 2012 WL 4739534 (E.D. Va. Oct. 2, 2012), motion to certify

Plaintiffs in this case can easily demonstrate that they are similarly situated with the potential plaintiffs to whom they seek to send notice.   Plaintiffs and the potential opt-in plaintiffs: (a) shared the same "entertainer" job duties and responsibilities at the same facility; (b) have all been improperly classified as independent contractors; (c) have not been paid a minimum wage for the work they performed for Defendant; (d) have not been paid statutory overtime compensation; (e) were required to pay Defendant certain fees in order to work for Defendant; and (f) were subject to the same price structures and rules of conduct while working in Defendant's club.  Many of Defendant's current and former entertainers remain unknown to Plaintiffs and Plaintiffs' Counsel.   It is precisely these similarly situated individuals who will benefit from judicial notice, giving them the opportunity to join this lawsuit while they still have claims that are not time-barred.  *See* 29 U.S.C. § 255(a) (providing a short three-year statute of limitations for willful violations of the FLSA); *MacGregor v. Farmers Ins. Exch.*, No. 10-03088, 2011 WL 2731227 (D.S.C. July 13, 2011) (noting that "the statute of limitations continue to run

_____

appeal denied, No. 12-00363, 2013 WL 150722 (E.D. Va. Jan. 11, 2013) ("At this stage, the Court declines Defendant's invitation to engage in resolving factual disputes, decide substantive issues going to the merits of the case, or make credibility determinations"); *Butler v. DirectSAT USA, LLC*, 876 F.Supp.2d 560, 570 (D. Md. 2012) (finding that Defendant's argument "delves too deeply into the merits of the dispute at this initial notice stage," and explaining that "the merits of certain aspects of Plaintiffs' claims … are not appropriate to resolve at the conditional certification stage.  The touchstone at this stage is merely whether Plaintiffs have demonstrated some factual nexus connecting them to other potential plaintiffs as victims of an unlawful policy"); *Essame v. SSC Laurel Operating Co. LLC*, 847 F.Supp.2d 821, 825 (D. Md. 2012) (a fact-intensive inquiry "delves too deeply into the merits of the dispute; such a steep plunge is inappropriate for such an early stage of a FLSA collective action"); *Gregory v. Belfor USA Grp., Inc.*, No. 12-11, 2012 WL 3062696 (E.D. Va. July 26, 2012) ("at this stage, the Court declines Defendant's invitation to engage in resolving factual disputes, decide substantive issues going to the merits of the case, or make credibility determinations"); *Mitchel v. Crosby Corp.*, No. 10-2349, 2012 WL 4005535 (D. Md. Sept. 10, 2012) (finding that Defendant's argument "delves too deeply into the merits of the dispute at this initial notice stage," and explaining that "[t]o proceed as a collective action at this stage, Plaintiffs need only make a modest factual showing that they were victims of a common policy or practice that violated the FLSA").

for a potential claimant in an FLSA collective action until he or she consents in writing to become a party plaintiff").

Plaintiffs' proposed notice is attached hereto as **Exhibit 2**.  Plaintiffs respectfully request that the Court approve this notice and also order Defendant to post such notice in a conspicuous place at its North Myrtle Beach location and provide contact information for all potential plaintiffs.  Specifically, Plaintiffs request that Defendant be required to provide an updated computer-readable data file containing the names, job title, last known mailing addresses, telephone numbers, dates of employment, and the last four digits of the Social Security numbers of all current and former entertainers, who have worked for Defendant since March 1, 2012.  For the same reasons this Motion has been so routinely granted in this jurisdiction and elsewhere, it should also be granted here.

## II.     STATEMENT OF FACTS

### A.     Background Facts, Parties, and Procedural History

At all times from approximately March 1, 2012 to the present, (the "class period"), Defendant Crazy Horse Saloon and Restaurant, Inc. ("Defendant") has continuously operated a nightclub business located at 3001 Highway 17 South in North Myrtle Beach, South Carolina.  In the class period, the nightclub has been branded under the names "Crazy Horse Presents Thee New Dollhouse," and "Thee Dollhouse" (hereinafter, the club is referred to as "Dollhouse").  (Watson Dep.[3] 27:3–15.) Dollhouse is an adult entertainment club that features topless female dancers, or "entertainers." (*See* Def.'s Answer and Defenses to P.'s First Am. Compl. [Dkt. No. 45] at ¶ 15.)

---

[3] A true and correct copy of the relevant portions of the October 8, 2014 deposition transcript of Defendant's 30(b)(6) Corporate Designee, Laura Watson, is attached hereto as **Exhibit 3**.

Prior to 2012, two separate clubs were operating in the Myrtle Beach area, one known as Thee Dollhouse, located at 9719 North Kings Highway, Myrtle Beach (hereinafter referred to as the "old Dollhouse,") and another known as Crazy Horse, located at 3001 Highway 17 South, North Myrtle Beach (now the location of the current Dollhouse). In 2012, the lease of the old Dollhouse was due to expire. (Clark Dep.[4] 14:25–15:5; Hargadon Dep.[5] 40:11–41:9.) The owner of the Thee Dollhouse brand, Michael J. Peter, entered a licensing agreement with one of the owners of Defendant Crazy Horse Saloon and Restaurant, Inc., Tom Hughes, to move the Thee Dollhouse branding to the Crazy Horse location at 3001 Highway 17 South in North Myrtle Beach. (Peter Dep.[6] 53:1–54:24; *see also id.* at 64:11–66:23 (discussing circumstances behind agreement).) Peter and Hughes also agreed to restructure the ownership of Backbay Group, Inc., a North Carolina corporation which owns all of Defendant's stock. (*See generally* Peter Dep. 53:24–56:22 (discussing ownership structure).) Hughes bought out his former partners, and eventually Peter and Hughes became 50/50 owners of Backbay Group, Inc., which owns Defendant and in turn the current Dollhouse club. (Watson Dep. 21:18–22:9.) During the transition, which began in March 2012, many personnel from the old Dollhouse moved to the Crazy Horse/new Dollhouse location, and the old Dollhouse closed for business in approximately September 2012. (Clark Dep. 15:6–17, 19:16–20:10.)

This lawsuit is limited to claims against Defendant for the period of time beginning with the former Crazy Horse's rebranding under the Dollhouse name in March 2012. Named Plaintiff

---

[4] A true and correct copy of the relevant portions of the October 28, 2014 deposition transcript of Defendant's branding consultant, Brent Clark, is attached hereto as **Exhibit 4**.

[5] A true and correct copy of the relevant portions of the October 28, 2014 deposition transcript of Defendant's former general manager, Joseph Hargadon, is attached hereto as **Exhibit 5**.

[6] A true and correct copy of the relevant portions of the November 21, 2014 deposition transcript of Defendant's co-owner/licensor, Michael J. Peter, is attached hereto as **Exhibit 6**.

Alexis DeGidio worked as an entertainer at Dollhouse during the class period, from approximately July 2012 through April 2013. (*See* DeGidio Dep.[7] 117:21–120:25.)

On August 8, 2013, Plaintiff DeGidio brought this collective action under the FLSA on behalf of herself and other similarly situated entertainers whom Defendant has misclassified as "independent contractors" and, among other things, has failed to pay a minimum wage. (Dkt. No. 1). Plaintiff DeGidio also brought class claims under South Carolina state law pursuant to Rule 23 of the Federal Rules of Civil Procedure. *Id.* Plaintiffs filed an amended complaint on May 29, 2014, correcting certain dates but otherwise asserting the same claims as the original complaint. (Dkt. 42). Opt-in plaintiff Jacinda Gardner joined the suit on November 25, 2013. (Dkt. 33). Opt-in Dawn Ungaro joined the suit on November 12, 2014. (Dkt. 62).

Plaintiffs estimate that, during the class period, several hundred individuals have worked as entertainers for Defendant. This estimate is based on testimony that as many as 60-80 entertainers or more may work at Dollhouse during a single shift. (Davenport Dep.[8] 56:16–19; Clark Dep. 34:8–19, 39:6–17 (confirming possibility that 100 entertainers may work a single night); Callicutt Dep.[9] 73:1–7 (estimating that as many 120 independent contractors may work a shift, including "shot girls," "massage girls," and entertainers); Miller Dep.[10] 23:15–18 (estimating up to eighty per night).)

---

[7] A true and correct copy of the relevant portions of the October 7, 2014 deposition transcript of Plaintiff Alexis DeGidio is attached hereto as **Exhibit 7**.

[8] A true and correct copy of the relevant portions of the October 28, 2014 deposition transcript of Defendant's general manager Jack Davenport is attached hereto as **Exhibit 8**.

[9] A true and correct copy of the relevant portions of the October 7, 2014 deposition transcript of Defendant's "house mom" Laurie Callicutt is attached hereto as **Exhibit 9**.

[10] A true and correct copy of the relevant portions of the October 7, 2014 deposition transcript of Defendant's daytime manager/floor host Joseph Miller is attached hereto as **Exhibit 10**.

**B.**    **Defendant's Policies and Practices Applicable to All Dollhouse Entertainers**

Defendant operates under uniform policies applicable to all entertainers, including

Plaintiffs.  Through these policies and procedures, Defendant maintained significant supervision

and control over Plaintiffs and the putative opt-in plaintiffs, despite the fact that all entertainers

who perform at Dollhouse have been characterized by Defendant as independent contractors

throughout the class period.  (Davenport Dep. 51:7–10; Watson Dep. 84:2–10; Clark Dep. 56:2–

5.) As a result of this misclassification, Dollhouse does not pay entertainers any wages or include

them on payroll.  (Clark Dep. 56:6–10; Miller Dep. 15:13–16; Watson Dep. 84:2–10, 86:9–20;

Davenport Dep. 51:7–10.)  Rather, to earn money for working at Dollhouse, entertainers rely on

tips received from Defendant's customers.  (Watson Dep. 86:25–87:7, 88:5–24; Davenport Dep.

71:23–72:3; Callicutt Dep. 262:11–15.)

Defendant has the exclusive power to hire and fire entertainers. (*See* Davenport Dep.

19:5–15; Callicutt Dep. 206:9–17; Trowbridge Dep.[11] 25:4–12; Clark Dep. 43:9–12.) Women

who wish to become entertainers at Dollhouse must apply and give a brief audition for the club's

managers.  (Davenport Dep.  13:3–13; Callicutt Dep. 79:17–20.) The club's general managers

have sole discretion to permit an applicant to continue as an entertainer.  (Clark Dep. 43:6–12;

Trowbridge Dep. 25:4–7.)

Entertainers' primary job duties are simply to entertain Defendant's customers by

providing conversation and semi-nude dances on Dollhouses' stages, the floor of the club, and in

the club's couch and VIP areas.  (Callicutt Dep. 25:11–18, 28:9–20.) In essence, the job of an

exotic dancer or entertainer requires nothing more than a willingness to take one's clothes off in

front of a club's customers.  (Callicutt Dep. 29:5–21 "Q: So then that means take your clothes off

---

[11] A true and correct copy of the relevant portions of the October 8, 2014 deposition transcript of
Defendant's manager John Trowbridge is attached hereto as **Exhibit 11**.

and talk to people and even talking to people is optional? A: Correct.  Q: So if I'm kind of [paring] it down now, so basically the job is just to take your clothes off? A: Yes.") Consistent with these limited expectations, the primary factor used by Defendant to evaluate whether a woman will be hired is her appearance, not her dancing ability or artistic skill.  (Davenport Dep. 13:19–24; Trowbridge Dep. 25:14–19; Callicutt Dep. 77:17–22, 82:21–23 (Q: So they are basically just presenting their bodies for inspection? A: Correct.").)  No special skills or training are required.  (Callicutt Dep. 28:21–29:1 ("Q: Does it require any kind of artistic skill? A: No. Q: Does it require really any kind of training at all? A: No.").)  The process is not very selective; a significant majority of the women who apply to dance at Dollhouse are accepted. (Davenport Dep. 14:3–6 (estimating 70% are accepted); Trowbridge Dep. 25:23–26:14 (estimating 80% are accepted).)

　　　If an applicant is accepted, the club's house mom and managers give the entertainer an orientation before the entertainer can begin dancing. (Davenport Dep. 16:14–17:5; Trowbridge Dep. 45:1–7;  Hargadon Dep. 31:16–33:4.)   She must read and sign several documents and prove her age by providing photo identification. (Clark Dep. 78:3–23.)  She is told at that point what the club's rules are, including the club's house fees, dress code, minimum dance prices, stage rotations, required tip-outs, and the golden dollar system, and she is informed about the club's online webcam system. (Callicutt Dep. 159:23–160:24 (tip-outs), *id.* at 147:5–9 (dance prices), *id.* at 153:5–8 (golden dollars), *id.* at 84:2–19 (webcams); Davenport Dep. 16:14–17:5 (house fees, tip-outs), *id.* at 26:24–28:2 (webcam); Trowbridge Dep. 140:7–17 (stage rotations); Hargadon Dep. 31:24–32:16 (house fees, dress code, general rules).)

　　　Defendant mandates that entertainers pay it a "house fee" for each shift they work, and the House Mom is responsible for collecting the house fees from entertainers and forwarding that

money to management.  (*See* Miller Dep. 47:7–21; Hargadon Dep. 70:2–16; Callicutt Dep. 154:24–155:3, 189:6–7; 194:9–14.) Defendant's house fees vary depending upon the entertainers' arrival time, with house fees escalating for later shifts.  For example, the house fee for entertainers who arrive between 7:00 pm and 8:00 pm is twenty dollars ($20); between 8:00 pm and 9:00 pm, the fee is forty dollars ($40), and so on as the night progresses.  (Callicutt Dep. 155:8–10.)  If an entertainer fails to pay her house fee on a given night, the house mom logs the back fees due, and entertainers will be required to pay the outstanding house fee in the future. (Hargadon Dep. 74:22–75:2, 76:1–22, 99:1–13; Davenport Dep. 41:5–42:17.)

Defendant mandates the minimum prices its entertainers may charge customers for dances, and entertainers are not permitted to go below Defendant's set pricing schedule.  (*See* Hargadon Dep. 64:19–65:6; Davenport Dep. 50:3–8; Exhibit 12 ("VIP Rooms" price list).)[12] For example, Defendant requires its entertainers to charge customers a minimum of $30 for a couch dance, of which the club takes $10, $150 for every fifteen minutes in a "VIP room," of which the club takes $25 per fifteen minutes, and $600 for every 30 minutes in one of the club's Jacuzzis, of which the club takes $200 per 30 minutes.  (*See* Miller Dep. 95:8–11; Trowbridge Dep. 58:7–60:13; Ex. 12.)  Defendant maintains a sign in its dressing room informing entertainers of its mandatory house fee system and minimum prices for private dances.  (*See* Callicutt Dep. at 237, 242–43; Davenport Dep. 49:15–21.)  All VIP room transactions are monitored by a floor host stationed outside of the rooms who collects the club's portion of the fee and tracks the total dances given on nightly lists.  (Davenport Dep. 45:5–14; Trowbridge 73:24–74:15; Watson Dep. 165:10–17.)

---

[12] **<u>Exhibit 12</u>** is a true and correct copy of a document originally produced by Defendant and introduced as Exhibit 5 in the Clark, Davenport, and Hargadon depositions.

Dancers are required to tip several of Defendant's employees every shift.  Defendant requires entertainers to tip its disc jockeys ten dollars ($10) per shift or 10% of the entertainer's total earnings if she made more than $100.  (Davenport Dep. 17:10–21; DeGidio Dep. 95:11–96:1; Gardner Dep.[13] 60:11–13; Trowbridge Dep. 48:16–18.)  Defendant requires entertainers to tip Defendant's house mom a minimum of ten dollars ($10) per shift. (Davenport Dep. 17:19–20; DeGidio Dep. 92:25–93:3; Gardner Dep. 59:7–10.)  In addition, Defendant requires that entertainers tip each of Defendant's floormen at least two dollars ($2) per shift.  (Davenport Dep. 17:19–20; DeGidio Dep. 93:4–15; Gardner Dep. 62:12–22; Trowbridge Dep. 66:9–11.)

Defendant does not allow its customers to use their credit cards to directly tip entertainers or directly buy private dances.  (Watson Dep. 184:24–185:11.)  Rather, Defendant sells to its customers artificial currency referred to as "golden dollars," which can only be used for tipping or buying private dances.  (*See* Clark Dep. 64:23–66:22.)  Customers pay a ten percent (10%) premium to purchase golden dollars from Defendant.  (*Id.*)  In addition, entertainers are required to pay Defendant a ten percent (10%) fee in order to have the golden dollars they receive as payment from customers redeemed for U.S. currency.  (*Id.* at 66:21–22.)  Defendant sells thousands of dollars' worth of golden dollars on an average night, and golden dollar sales make up 12-15% of Defendant's gross annual revenues.  (Trowbridge Dep. 84:7–12; Watson Dep. 43:10–11.)

Defendant requires its entertainers to check-in at three places at the beginning of each shift: with the front door host, with the house mom, and with the DJ.  (Trowbridge Dep. 18:25–19:6 (front door); Davenport Dep. 29:22–30:2 (front door); Callicutt Dep. 125:22–126:5 (front door), 128:3–17 (house mom), 164:4–6 (DJ); Clark Dep. 40:9–16 (DJ).)  Defendant has the

---

[13] A true and correct copy of the relevant portions of the October 7, 2014 deposition transcript of opt-in plaintiff Jacinda Gardner is attached hereto as **Exhibit 13**.

authority to control the shifts that entertainers are permitted to work, and has required certain

entertainers to work the typically less lucrative daytime or happy hour shifts.  (Hargadon Dep.

35:20–36:9 (if an entertainer is failing to live up to standards, Defendant "might put them on a

day shift."); DeGidio Dep. 99:11–20 ("If they didn't think you were up to par, they would make

you work on a happy hour."); Gardner Dep. 66:17–69:9 ("The manager would tell you, 'You

have to work a happy hour [shift] or you don't have a job,' and it's just what you had to do.").) If

Defendant's daytime managers believe that there are too few entertainers in the club, they and

the house mom will contact entertainers and tell them that they need to come to the club.

(Gardner Dep. 22:11–16, 74:5–12; Miller Dep. 23:25–24:23, 58:1–12.)  Entertainers must obtain

permission from Defendant's managers before they are allowed to leave, and on some occasions

Defendant's managers have pressured entertainers to stay in the club.  (Davenport Dep. 32:20–

33:5; Gardner Dep. 73:20–74:22.)  Defendant does not permit its locally-based entertainers to

perform at other clubs in the area while performing for Dollhouse.  (DeGidio Dep. 47:3–24;

Gardner Dep. 11:20–12:14; Hargadon Dep. 95:8–25.)

 Defendant's ownership and management consider Michael J. Peter's Dollhouse brand to

represent an upscale gentlemen's club or "show club," as distinguished from a typical "strip

club." (Clark Dep. 23:4–24:7; Davenport Dep. 21:17–21; Hargadon Dep. 24:1–23 ("You're

taking a stripper and turning her into an entertainer. You're taking a strip club and turning it into

a gentleman's club or an adult entertainment facility.  That was the concept…and it still is.").)

 Defendant makes a considerable investment in protecting the brand's integrity, going so

far as to contract with a consultant, Brent Clark, a long-time associate of Michael J. Peter, whose

primary job function is assist the club with the implementation of the branding through the use of

the Michael J. Peter "show standards." (Clark Dep. 17:21–18:11 (Q: What do you consult them

about? A: … And I have had many years of working, consulting, participating with Thee

Dollhouse branding, the name. And [its] theory and philosophy and history and format. So,

basically, because of my knowledge of how that format needs to be presented, I oversee for the

mark owner to make sure that that's being ran properly with integrity to the name."); Peter Dep.

90:14–19; 105:2–6 ("I rely on Brent to make sure that my brand, my name and everything

functions satisfactorily."); Hargadon Dep. 42:15–43:6.)

     As the Dollhouse brand was implemented at the former Crazy Horse location in 2012,

Clark and Dollhouse management worked together to bring the Michael J. Peter show standards

to the new location. (*See generally* Clark 46:15–47:19; Hargadon Dep. 41:10–45:21 (discussing

transition).)  This involved a significant tightening of rules, as the former Crazy Horse was

considered a looser environment, not up to the standards of the Dollhouse brand.  (*See generally*

Clark 46:15–47:19; Hargadon Dep. 41:10–45:21.)

     Consistent with the Dollhouse branding strategy, Defendant maintains high standards of

physical appearance for its entertainers, including a dress code.  Entertainers must appear "high

class":

> Q: Now, is it true that Thee Dollhouse has certain expectations about the
> way dancers will be dressed when they are at the club?
> A: They do.
> Q: What are those expectations?
> A: That the -- the criteria is we – we try to be a show club, not a strip club,
> and we try to have our -- our entertainers in gowns and look appropriately,
> gloves, accessories, try to look as -- as -- as fine as they possibly can.
> Q: High class?
> A: High class would be a great word for it.

(Davenport Dep. 21:12–24; *see also* Trowbridge Dep. 148:18–149:3; Clark Dep. 23:23–24:7

("As a show club, we'd like for our entertainers to present in a certain manner; i.e., nails done,

hair done, makeup done, proper attire. Proper attire to us is a – a nice evening gown or a dress

that they can bring in and if it fits our format, they can wear it."); Hargadon Dep. 43:11–21 ("But when Michael [Peter] became more prominent – had a more prominent role in the club, he wanted the dress code to be more stringent, more tight.  I allowed cocktails dresses, and I allowed the entertainers to change into whatever they wanted after two a.m. in the morning.  He didn't want that. He wanted them all in dresses or long gowns."); DeGidio Dep. 85:17–18 ("You had to have gowns to the ankle.").) Pursuant to this code, entertainers may not wear street clothes such as jeans or tennis shoes while working.  (Callicutt Dep. 121:12–122:4.)

The house mom, as an extension of management, is responsible for ensuring that entertainers conform to the dress code before the entertainer may go to the floor to work. (Hargadon Dep. 76:16–21; Clark Dep. 52:17–20.)  Entertainers understand that their appearance must conform with the Dollhouse brand/format if they want to continue dancing there. (Hargadon Dep. 38:19–39:1.)  If management observes an entertainer on the floor in nonconforming attire, she will be told that she needs to find another outfit that fits the Dollhouse branding.  (Clark Dep. 25:21–26:21.)  While the club's house mom will occasionally loan new entertainers a dress to get them started, entertainers generally must pay for their own outfits and laundering.  (Callicutt Dep. 129:10–130:10.)

 The Michael J. Peter/Dollhouse brand show standards include additional miscellaneous rules of conduct which entertainers must follow, including: no gum chewing, no carrying cigarettes on the floor, and no cell phones on the floor. (Hargadon Dep. 21:5–12 ("we didn't want them chewing gum. We didn't want them walking with cigarettes in their hand. We didn't want them carrying a drink across a ta--- across a room. They should have asked -- if they had a drink, they should ask a floorman to carry it for them. Things that would elevate the entertainer from being a stripper to an entertainer."); *see also* Trowbridge Dep. 134:16–136:18 (confirming no

gum chewing, smoking only while sitting at a table, cellphones must be kept in dressing room).)

Entertainers do not have the authority to change any of the rules in the club.  (Trowbridge Dep.

167:12–18.)

Entertainers are directed to various areas of the club by Defendant's DJ and floormen

based on a stage rotation and the requests of customers.  (Miller Dep. 84:6–20; Trowbridge Dep.

87:6–89:5.)  Defendant's employees utilize a radio headset system to coordinate their

supervision of entertainers, including tracking the location of particular entertainers when they

are expected to be on stage. (Miller Dep. 43:19–44:22; Callicutt 220:2–24; Trowbridge Dep.

30:23–31:5, 34:8–24, 35:13–36:7.)

Defendant's disc jockeys, and not the entertainers, choose the music that accompanies

entertainers' dances. (Trowbridge Dep. 142:17–143:2; Callicutt Dep. 215:11–23.) Defendant

requires entertainers to work rotations on Dollhouse's stages of three songs per rotation.

(Callicutt Dep. 162:22–163:4, 164:20–165:10; Trowbridge Dep. 140:3–17.)  Entertainers do not

control the sequence, timing, or length of their rotations.  (Callicutt Dep. 163:6–9 ("Well, the

D.J. decides who goes on stage when."); Miller Dep. 64:1–3.) Defendant directs its entertainers

as to when and how to disrobe when they are performing dance sets on stage.  (Miller Dep. 62:3–

11.)  Defendant does not allow entertainers to skip their stage rotations unless they are

performing private dances in the club's VIP area.  (Trowbridge Dep. 138:24–139:12 ("Q: What

if the dancer thinks she'll make more money by sitting with that customer? A: Then they can go

in the back room in the V.I.P area. Q: She can't just sit at the bar? A: … they have to make their

stage sets.  Come to the stage to make their sets."); Gardner Dep. 60:12–61:8.)  Indeed, the day

manager testified that he will write down the names of entertainers who do not go on stage so the

closing manager or house mom can discipline them later.  (Miller Dep. 45:25–46:19.)  As further

evidence that the stage rotation is mandatory, entertainers have in the past had to give money to the DJ in order to skip their rotation on stage so they can continue entertaining paying customers without interruption. (Gardner Dep. 60:12–61:8; Callicutt Dep. 164:24–165:10.) Defendant's managers and DJ control which stages are open to entertainers.  (Miller Dep. 16:20–18:1; Trowbridge Dep. 32:2–33:25.)

Defendant requires entertainers to participate in "promo" work, such as selling Dollhouse merchandise and selling dances at specific prices to customers.  For instance, several times per night the DJ initiates a "two for one" dance promotion.  (Davenport Dep. 46:23–47:20.) Entertainers are required to line up and walk on stage with one of Dollhouse's promotional items, and the DJ announces that customers may buy a two song dance and the promotional item for $50.  (*Id*; Callicutt Dep.171:15–172:18.)  Notably, the club takes a $30 cut of the promotional sales, 60% of the total price.  (Callicutt Dep. 172:19–23.)

As a result of Defendant's mandatory house fees and expected tip-outs, in addition to the fact that Defendant takes a portion of the money entertainers received from customers for dances, entertainers could actually lose money working at Dollhouse.  Indeed, Plaintiffs DeGidio and Gardner actually lost money during some shifts at Dollhouse.  (DeGidio Dep. 91:1–3 ("Q: So you're saying you always tipped the floor men? A: You had to, no matter what. Even if, even if you made nothing."), 91:20–25 ("Q: Where there ever occasions where you did not tip the deejay? A: You had to tip him, so no.  No matter what, what you made, it had to be tipped…if I didn't have the money to tip that night, it would go in minus."); Gardner Dep. 75:17–20 ("Some nights, I was completely negative. Some nights, even if you've made the money, with what you have to pay out, you still don't have any money.").)

Defendant has installed two webcams in the club which broadcast over the internet at all times the club is open.  (Callicutt Dep. 91:24–92:2.)  One is directed at the club's main stage, and the other shows a portion of the entertainers' dressing room.  (Davenport Dep. 25:22–26:2; Clark Dep. 77:6–10.) The worldwide public may view the main stage through a link on Defendant's website for no charge.  (Watson Dep. 232:3–14.)  If an entertainer does not want to appear on the internet, her only options are to not work at Dollhouse or to avoid the main stage and the area of the dressing room where the second camera is located. (Watson Dep. 218:8–220:12; Callicutt Dep. 90:1–17.)  Defendant does not pay entertainers anything for the use of their images on the internet, and an entertainer can only receive tips from online viewers if the entertainer registers a profile with Club Cam Systems, a company with whom Defendant contracts to manage the webcam system. (Callicutt Dep. 84:10–19, 91:17–21; Watson Dep. 232:3–14.)

In summary, Defendant maintains significant supervision and control over Plaintiffs and the putative collective action members, and sets uniform rules and regulations governing the conditions under which all entertainers work.  Despite Defendant's classification of entertainers as independent contractors and consequent failure to pay minimum or overtime wages, entertainers are legally Defendant's employees.  Unlike true independent contractors, entertainers are closely controlled and supervised by Defendant's management, and must follow a plethora of rules which exist primarily for the benefit of Defendant, including, but not limited to:  (i) all entertainers must sign in at multiple stations upon arrival for work; (ii) all entertainers are subject to Defendant's rules regarding dress code and conduct on the floor; (iii) all entertainers must pay Defendant's house fees, (iv) entertainers may not compete with each other in the club by offering private dance prices below the minimum prices established by Defendant; (v) entertainers must pay Defendant's 10% surcharge to convert golden dollars into legal

currency; (vi) all entertainers are pressured to participate in Defendant's tip sharing system with the house mom, DJ, and floormen; (vii) all entertainers must consent to the broadcasting of their image through Defendant's webcams; (viii) all entertainers must perform on stages at the direction of the DJ and to the music chosen by the DJ; and (ix) all entertainers must participate in two-for-one promotions, and Defendant takes a 60% share of the proceeds of those sales.

The proof of Defendant's significant supervision and control will be made on a club-wide basis, because such proof exclusively focuses upon the conduct of the Defendant itself and the implementation of its commonly applied policies and practices with regard to all entertainers. In fact, Defendant's corporate designee witness repeatedly testified that all entertainers are similarly situated with respect to the policies and practices at issue. (Watson Dep. 85:5–9 (all entertainers are classified as independent contractors), *id.* at 86:21–24 (the club pays no money to any entertainers); *id.* at 91:25–92:17 (all entertainers are similarly situated with respect to potential sources of income in the club); *id.* at 100:16–22 (all entertainers are similarly told to tip house mom, floormen, and DJs); *id.* at 104:14–105:10 (all entertainers are subject to DJ's coordination of stage rotations); *id.* at 147:21–148:12 (all entertainers are subject to same couch dance price structure); *id.* at 150:5–21 (all entertainers are similarly situated with respect to VIP room price structure); *id.* at 185:22–25 (all entertainers are similarly situated with respect to golden dollars); *id.* at 222:11–14 (all entertainers are similarly situated with respect to webcam system).) This testimony is corroborated by Defendant's managers, who testified that they apply the rules consistently to all entertainers:

> Q: There's one category of dancer. There's a dancer and that's it, right?
> A: It's an entertainer.
> Q: Entertainer.
> A: Yeah.
> Q: And the rules that apply to dancers, they all apply to all the dancers, right?
> A As far as what the club -- yes.

17

Q: You -- you treat them all the same, right?
A: Absolutely.
Q: Okay. Treat them fairly.
A: Fairly, yeah.
Q: Yeah. Generally speaking, there are not exemptions from the rules, right?
A: No.

(Trowbridge Dep. 111:5–19; *see also* Miller Dep. 59:2–5 (house fees apply to all); *id.* at 59:16–60:2 (VIP room fees apply to all); Hargadon Dep. 79:13–23.)

Because Plaintiffs are alleging that they and the other potential opt-in plaintiffs were together the victims of common policies and practices by Defendant which violate the law, and can prove the existence of such policies and practices through common evidence, Plaintiffs and the potential opt-in plaintiffs are similarly-situated and notice pursuant to Section 216(b) of the FLSA is appropriate.

## III.    ARGUMENT

### A.    Conditional Collective Action Certification And Judicial Notice Are Proper In This Case

Plaintiffs seek conditional certification and court-facilitated notice in this collective action pursuant to the FLSA, 29 U.S.C. § 216(b), which provides that an action may be maintained against any employer in federal court "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). The collective action mechanism allows for efficient adjudication of similar claims so that "similarly situated" employees, whose claims are often small and not likely to be brought on an individual basis, may join together and pool their resources to prosecute their claims. *See Hoffmann-La Roche Inc.*, 493 U.S. at 170.

An FLSA collective action is defined by three important features: First, in order to participate in a collective action, an employee must "opt in," meaning the employee must consent in writing to join the suit and that consent must be filed with the court. *Id.* at 168.

18

Second, the statute of limitations runs on each employee's claim until that individual files a consent form with the court. *MacGregor v. Farmers Ins. Exch.*, No. 10-03088, 2011 WL 2731227 (D.S.C. July 13, 2011). Third, to serve the "broad remedial purpose" of the FLSA, courts can order notice to other potential similarly situated employees to inform them of this opportunity to opt into to the case. *Hoffmann-La Roche*, 493 U.S. at 173.

Critically, judicial notice avoids a "multiplicity of duplicative suits," allows the court to set deadlines to advance the disposition of an action, and protects potential plaintiffs' claims from expiring under the statute of limitations. *Id.* at 171–73. Accordingly, the provision of judicial notice is consistent with the remedial purpose of the FLSA. *See Quinteros v. Sparkle Cleaning, Inc.*, 532 F.Supp.2d 762, 771 (D. Md. 2008) ("To effectuate the remedial purposes of the Act, it is well settled that district courts have discretion, in appropriate cases, to allow such claims to proceed as a collective action and to facilitate notice to potential plaintiffs").

Here, conditional certification and judicial notice are proper because Plaintiffs have offered abundant evidence that they are similarly situated to members of the putative collective action.

### 1. District Courts Within The Fourth Circuit Apply A Two-Stage Certification Process

Within the Fourth Circuit, the procedure to certify a collective action has evolved into a two-stage process. *See, e.g., Purdham v. Fairfax County Pub. Schools*, 629 F.Supp.2d 544, 547-48 (E.D. Va. 2009) (applying two-stage approach while noting that "the Fourth Circuit has not settled on a test for conditional certification in an FLSA action"); *see also Pelczynski v. Orange Lake Country Club, Inc.*, 284 F.R.D. 364, 367-68 (D.S.C. 2012); *Simons v. Pryor's, Inc.*, No. 11-0792, 2011 WL 6012484, at *1-2 (D.S.C. Nov. 30, 2011); *Steinberg v. T.Q. Logistics, Inc.*, No. 10-2507, 2011 WL 1335191, at *1-2 (D.S.C. Apr. 7, 2011).

19

The first step is the "notice stage," where the court determines, based simply on the pleadings and any affidavits submitted, whether the plaintiff and potential opt-in plaintiffs are sufficiently "similarly situated" to issue notice and allow the case to proceed as a collective action. Once the court determines that potential opt-in plaintiffs may be "similarly situated" for the purposes of authorizing judicial notice, the court "conditionally certifies" the collective action, and the plaintiff sends court-approved notice to potential plaintiffs. Upon receiving notice, the potential plaintiffs may elect to opt into the lawsuit pursuant to section 216(b) by filing written consents with the court. *See Curtis v. Time Warner Entm't-Advance/Newhouse P'ship*, No. 12-2370, 2013 WL 1874848 (D.S.C. May 3, 2013); *Pelczynski v. Orange Lake Country Club, Inc.*, 284 F.R.D. 364, 367-68 (D.S.C. 2012); *Simons v. Pryor's, Inc.*, No. 11-0792, 2011 WL 3158724 (D.S.C. July 26, 2011)

At the second step, typically on a motion for decertification, the court undertakes a more stringent factual determination as to whether members of the collective class are, in fact, similarly situated. If, after discovery, it is apparent that plaintiffs and others are not similarly situated, the court may "de-certify" the collective and dismiss the claims of the opt-in plaintiffs without prejudice. *See id.*

In this case, the parties have engaged in written discovery and numerous depositions. If the Court chooses not to use the more lenient standard for initial certification, as Plaintiffs propose, the most appropriate alternative is the "intermediate" standard used by courts to determine initial certification after some amount of discovery has been conducted. Although this intermediate standard has not been clearly articulated by courts in this circuit, several district courts have recently employed this analysis:

> [I]n order to provide some measurable standard by which to judge if
> Plaintiffs have made a sufficient modest "plus" factual showing ... this

Court will compare Plaintiffs' allegations set forth in their Complaint with the factual record assembled through discovery to determine whether Plaintiffs have made sufficient showing beyond their original allegations that would tend to make it more likely that a class of similarly situated employees exists.

*Kayser v. Sw. Bell Tel. Co.*, 912 F. Supp. 2d 803, 812 (E.D. Mo. 2012) (citing *McClean v. Health Systems, Inc.*, No. 11–03037–CV–S–DGK, 2011 WL 6153091, at *4 (W.D.Mo. Dec. 12, 2011) & *Creely v. HCR ManorCare, Inc.*, 789 F.Supp.2d 819, 826–28 (N.D. Ohio 2011)).

Regardless of the standard used, however, this court should conditionally certify the class and authorize notice. Plaintiffs have put forward significant evidence beyond the pleadings that they is similarly situated to the other entertainers who worked at Defendant's club.

### 2. The Standard For Conditional Class Certification And Judicial Notice In FLSA Collective Actions Is Minimal

The burden for demonstrating that potential plaintiffs are "similarly situated" is very low at the notice stage: plaintiffs need make only a "modest factual showing" that plaintiff and potential collective action members were victims of "a common policy or plan that violated the law." This burden is "limited," "minimal", "lenient", and "not a stringent one."[14] The minimal

---

[14] *Allen v. Cogent Commc'ns, Inc.*, No. 14-459, 2014 WL 4270077 (E.D. Va. Aug. 28, 2014) ("The plaintiff's evidentiary burden at this [first] stage is fairly lenient and requires only minimal evidence"); *Regan v. City of Charleston, S.C.*, No. 13-3046, 2014 WL 3530135 (D.S.C. July 16, 2014) (explaining that whether the plaintiff has carried his burden of showing that he is similarly situated to the other putative class members "is made using a fairly lenient standard"); *Ruiz v. Monterey of Lusby, Inc.*, No. 13-3792, 2014 WL 1793786 (D. Md. May 5, 2014) ("To satisfy this [phase one] standard, plaintiffs generally need only make a relatively modest factual showing that such a common policy, scheme, or plan exists"); *Amrhein v. Regency Mgmt. Servs., LLC*, No. 13-1114, 2014 WL 1155356 (D. Md. Mar. 20, 2014) (the determination of whether the plaintiff has shown that he is similarly situated to the other putative class members "is made using a fairly lenient standard, and typically results in conditional certification of a representative class"); *Visco v. Aiken Cnty., S.C.*, 974 F.Supp.2d 908, 915 (D.S.C. 2013) ("To demonstrate that other potential plaintiffs are similarly situated to him, a plaintiff must make only a modest factual showing sufficient to demonstrate that he and potential plaintiffs together were victims of a common policy or plan that violated the law. A plaintiff's burden at this stage is minimal, especially since the determination that potential plaintiffs are similarly situated is merely a preliminary one"); *Curtis v. Time Warner Entm't-Advance/Newhouse P'ship*, No. 12-2370, 2013

showing required to meet the similarly situated standard is particularly apparent when examined in the context of misclassification.  In fact, numerous federal courts, including courts in this Circuit, have granted conditional certification and authorized dissemination of judicial notice based on a simple showing that other employees may also have been subjected to the employer's practice of "misclassifying" employees.  *See, e.g.*, *Montoya v. S.C.C.P. Painting Contractors, Inc.*, No. 07-455, 2008 WL 554114 (D. Md. Feb. 26, 2008) ("the potential misclassification of the plaintiffs, in violation of FLSA's mandate that "employee" be interpreted broadly, could be enough for class certification") (citing *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 197-98 (S.D.N.Y. 2006) (recognizing that "common policy or plan" may include the misclassification of employees as independent contractors) and *Westfall v. Kendle*, No. 05-118, 2007 WL 486606, at *9-10 (N.D. W. Va. Feb. 15, 2007) (holding that misclassification of employees as independent contractors was sufficient to meet the similarly situated requirement, despite the defendant's argument that the court needed to examine each worker-employer relationship independently)); *Houston v. URS Corp.*, 591 F.Supp.2d 827, 833-34 (E.D. Va. 2008) (finding that "Plaintiffs have sufficiently alleged a common policy or plan in that all inspectors were classified as independent contractors rather than employees," reasoning that "[a]s other courts have found, plaintiffs are similarly situated to a class when they raise a similar legal issue as to coverage, exemption, or nonpayment of minimum wages or overtime arising from at least a manageably similar factual setting with respect to their job requirements and pay provisions," and noting that "at least one court has concluded that an alleged misclassification as independent contractors alone could be

---

WL 1874848 (D.S.C. May 3, 2013) ("The plaintiff bears a low standard of proof at this [first] stage because the district court is simply determining whether similarly situated plaintiffs do in fact exist"); *Mcfeeley v. Jackson St. Entm't, LLC*, No. 12-1019, 2012 WL 5928902 (D. Md. Nov. 26, 2012) (To satisfy this [phase one] standard, plaintiffs generally need only make a relatively modest factual showing that such a common policy, scheme, or plan exists").

enough for conditional certification") (citing *Montoya*, 2008 WL 554114, at *3); *Williams v. XE Servs., LLC*, No. 09-59, 2011 WL 52353 (E.D.N.C. Jan. 4, 2011) (granting plaintiffs' motion for conditional certification based on allegations that they, and others similarly situated, were misclassified as independent contractors, when they should have been classified as employees under the FLSA).

Moreover, federal district courts throughout the country have routinely granted certification and authorized dissemination of judicial notice under circumstances substantially similar to those present here. *See, e.g., Hart v. Rick's Cabaret Int'l, Inc. et al.*, No. 09-3043, 2014 WL 6238175 at *18–23 (S.D.N.Y. Nov. 14, 2014) (denying Defendants' motions to decertify previously certified FLSA collective action and Rule 23(b)(3) class action); *Espinoza v. Galardi South Enterprises, Inc.*, No. 14-21244-CIV 2014 WL 5410307 (S.D. Fla. Oct. 23, 2014) (granting conditional certification after considering plaintiffs' shared job title, single geographic location, whether plaintiffs' were subject to the same policies and practices of defendant, and uniformity of alleged violations); *Verma v. 3001 Castor, Inc.*, No. 13-3034, 2014 WL 2957453 (E.D. Pa. June 30, 2014) (concluding that "as a matter of economic reality the entertainers at the Defendant's club are employees, not independent contractors, and finding that the plaintiff "met her fairly lenient burden at the conditional certification stage by making a modest factual showing that Defendant maintains a company-wide policy of treating members of the putative class as independent contractors"); *Stevenson v. Great Am. Dream, Inc.*, No. 12-3359, 2013 WL 4217128 (N.D. Ga. Aug. 14, 2013) (granting plaintiff's motion to conditionally certify a collective action of all entertainers who worked at Pin Ups Nightclub over the past three years); *Jones v. JGC Dallas LLC*, No. 11-2743, 2012 WL 6928101 (N.D. Tex. Nov. 29, 2012) (granting motion to conditionally certify collective action and to authorize notice, and further ordering

defendant to provide plaintiff with a list of the names, last known mailing addresses, and email addresses of all exotic entertainers who worked at defendant's member clubs during relevant time period in a computer readable format), report and recommendation adopted, No. 11-2743, 2013 WL 271665 (N.D. Tex. Jan. 23, 2013); *Nesselrodte v. Underground Casino & Lounge, LLC*, No. 11-92, 2012 WL 4378163 (N.D. W. Va. Sept. 25, 2012) (granting plaintiff's motion to facilitate identification and notification of similarly situated employees); *Ruffin v. Entm't of the E. Panhandle*, No. 11-19, 2012 WL 761659 (N.D. W.Va. Mar. 7, 2012) (granting conditional certification for a class defined as all former exotic entertainers who worked for any of the defendants' three exotic dance clubs in West Virginia during the relevant time period and were not paid at an hourly rate at least equal to the federal minimum wage); *Thompson v. Linda And A., Inc.*, 779 F.Supp.2d 139, 142 (D.D.C. 2011) (granting plaintiffs' motion for partial summary judgment, holding that gentlemen's club did not have reasonable grounds for believing that wage policy for exotic entertainers was in compliance with the FLSA, and noting that the court had previously issued an order directing the defendant to provide information that would facilitate the identification of other similarly situated plaintiffs); *Clincy v. Galardi S. Enterprises, Inc.*, 808 F.Supp.2d 1326, 1337 (N.D. Ga. 2011) (holding that entertainers were employees, rather than independent contractors, of defendant club, and noting that "[t]he Court conditionally certified the FLSA collective action in this case"); *Green v. Plantation of Louisiana*, LLC, No. 10-0364, 2010 WL 5256354, at *1 (W.D. La. Nov. 24, 2010) ("a class consisting of exotic entertainers should be conditionally certified"), report and recommendation adopted, No. 10-0364, 2010 WL 5256348 (W.D. La. Dec. 15, 2010).

### 3.    Plaintiffs Meet the Standard for Certification

This case is about Defendant's misclassification of Plaintiffs and all other former and current entertainers, and exemplifies exactly the type of situation in which conditional

certification and court-facilitated notice is appropriate. The evidence shows that Defendant maintains a company-wide policy of treating Plaintiffs and members of the putative class as independent contractors, and therefore fails to pay them the applicable minimum wage and premium overtime compensation as required by state and federal wage and hour laws. In addition to being similarly situated by virtue of being subjected to a common misclassification decision, Plaintiffs and the potential opt-in plaintiffs are also similarly-situated with regard to their job duties and the fact that Defendant exerts the same significant supervision and control over each of them, as a matter of policy and practice.

The proof of Defendant's policies and practices can be made on a club-wide basis and will focus on Defendant's conduct, as opposed to the experience of any individual entertainer. It is this common proof of Defendant's policies and practices which further binds Plaintiffs and the potential opt-in plaintiffs. Although Defendant will likely dispute some of Plaintiffs' factual assertions regarding the specific policies and practices in place at Dollhouse, the evidence overwhelmingly demonstrates that Defendant's policies, whatever they precisely happened to be, were uniformly applied to all entertainers. Thus the central legal question in this case, whether Plaintiffs and the potential opt-in plaintiffs were improperly classified as independent contractors, is readily susceptible to a single class-wide answer.

Plaintiffs' Amended Complaint alleges that Defendants' policies and practices relative to the misclassification of entertainers do not vary, but rather affect all entertainers who work at Dollhouse the same way. All entertainers perform the same primary job duties of dancing on stage, performing personal dances for customers, and spending time with customers in semi-private rooms. Further, all entertainers must perform these job duties under Defendant's constant supervision and control. All entertainers perform their duties within the confines of

25

Defendant's guidelines and are subject to discipline, including termination, for failure to comply with the guidelines.  Finally, entertainers were not ever paid hourly wages or overtime compensation, were required to pay a fee in order to work each night, and were also assessed other charges including mandatory tip-outs, golden dollar conversion charges, and private dance fee sharing with the club. These common facts establish that Plaintiffs and the potential opt-in plaintiffs are legally Defendant's employees.  Defendant's misclassification of entertainers as independent contractors and failure to pay them minimum or overtime wages means that together, all Dollhouse entertainers are the victims of "a common policy or plan that violated the law."  *Curtis v. Time Warner Entm't-Advance/Newhouse P'ship*, No. 12-2370, 2013 WL 1874848, at *2 (D.S.C. May 3, 2013).

As demonstrated throughout this Memorandum and in addition to the detailed allegations in the Amended Complaint, Plaintiffs' Motion is supported by Defendant's own statements and those of its managerial employees as set forth in voluminous witness testimony.  Taking into account the totality of the evidence presented, Plaintiffs have shown that all entertainers who have worked at Dollhouse since March 2012 are "similarly situated." Accordingly, this Court should grant Plaintiffs' Motion.

### 4.    Factors Not Considered At The Notice Stage

Given the minimal showing that Plaintiffs must make at the conditional certification stage, it is important to clarify what is not considered for purposes of conditional certification. Many standards commonly applied to other kinds of motions are not appropriate here.  For example, at the notice stage, courts do not weigh the merits of the underlying claims in determining whether potential opt-in plaintiffs may be "similarly situated."  *Long v. CPI Sec. Sys., Inc.*, 292 F.R.D. 296, 303 (W.D.N.C. 2013), motion to certify appeal denied, No. 12-396, 2013 WL 3761078 (W.D.N.C. July 16, 2013); *LaFleur v. Dollar Tree Stores, Inc.*, No. 12-

00363, 2012 WL 4739534 (E.D. Va. Oct. 2, 2012), motion to certify appeal denied, No. 12-00363, 2013 WL 150722 (E.D. Va. Jan. 11, 2013) ("At this stage, the Court declines Defendant's invitation to engage in resolving factual disputes, decide substantive issues going to the merits of the case, or make credibility determinations"); *Butler v. DirectSAT USA, LLC*, 876 F.Supp.2d 560, 570 (D. Md. 2012) (finding that Defendant's argument "delves too deeply into the merits of the dispute at this initial notice stage," and explaining that "the merits of certain aspects of Plaintiffs' claims … are not appropriate to resolve at the conditional certification stage.  The touchstone at this stage is merely whether Plaintiffs have demonstrated some factual nexus connecting them to other potential plaintiffs as victims of an unlawful policy"); *Essame v. SSC Laurel Operating Co. LLC*, 847 F.Supp.2d 821, 825 (D. Md. 2012) (a fact-intensive inquiry "delves too deeply into the merits of the dispute; such a steep plunge is inappropriate for such an early stage of a FLSA collective action"); *Gregory v. Belfor USA Grp., Inc.*, No. 12-11, 2012 WL 3062696 (E.D. Va. July 26, 2012) ("at this stage, the Court declines Defendant's invitation to engage in resolving factual disputes, decide substantive issues going to the merits of the case, or make credibility determinations"); *Mitchel v. Crosby Corp.*, No. 10-2349, 2012 WL 4005535 (D. Md. Sept. 10, 2012) (finding that Defendant's argument "delves too deeply into the merits of the dispute at this initial notice stage," and explaining that "[t]o proceed as a collective action at this stage, Plaintiffs need only make a modest factual showing that they were victims of a common policy or practice that violated the FLSA").

Similarly, minor differences in the day-to-day work tasks of the potential opt-in plaintiffs are not relevant.  *See, e.g., Randolph v. PowerComm Const., Inc.*, No. 13-1696, 2014 WL 1260722 (D. Md. Mar. 25, 2014) (noting that "differences as to time actually worked, wages actually due and hours involved are … not significant to the conditional certification

determination"); *Amrhein v. Regency Mgmt. Servs., LLC*, No. 13-1114, 2014 WL 1155356 (D. Md. Mar. 20, 2014) ("Class members need not be identical, only similar"); *LaFleur v. Dollar Tree Stores, Inc.*, No. 12-00363, 2014 WL 934379 (E.D. Va. Mar. 7, 2014) ("Insubstantial differences in job duties, hours worked and wages due that do not materially affect whether a group of employees may be properly classified are not significant to the similarly situated determination); *Long v. CPI Sec. Sys., Inc.*, 292 F.R.D. 296, 303 (W.D.N.C. 2013) ("courts have routinely recognized that where an employer has a common practice of failing to pay employees for all hours worked, factual distinctions of the type claimed by defendant provide no basis to deny initial certification of a collective action under the FLSA); *Benbow v. Gold Kist, Inc.*, No. 0-02751, 2007 WL 7595027 (D.S.C. Apr. 16, 2007) ("At this stage of the proceeding … Plaintiffs need only show that their positions are similar, not identical, to the positions held by the putative class members").

Because courts do not weigh the merits of the claim or examine factual variations at the notice stage, extensive discovery is not necessary, and the need for individual discovery is not considered.  *See, e.g.*, *Faust v. Comcast Cable Commc'ns Mgmt., LLC*, No. 10-2336, 2011 WL 5244421 (D. Md. Nov. 1, 2011) (rejecting defendant's argument that plaintiffs' claims were inappropriate for collective action because adjudicating the dispositive issue would require individualized inquiries that would burden the Court and the parties, reasoning that "[d]efendant ignores the fact that, at this stage of the litigation, the only question the Court needs to answer is whether or not employees in the proposed class are similarly situated"); *Thomas v. Louisiana-Pac. Corp.*, 246 F.R.D. 505, 514 (D.S.C. 2007) ("Courts have routinely rejected [defendant's] argument, concluding, as we have in previous cases, that the need for individualized proof of damages alone will not defeat class certification").

Further still, courts do not look to the standard for class certification under Rule 23 of the Federal Rules of Civil Procedure when deciding the conditional certification question under the FLSA.  In fact, unlike Rule 23, Section 216(b) requires no showing of numerosity, typicality, commonality, or representativeness.  As a result, the standard for authorizing notice to similarly-situated workers is much lower than under Rule 23.  *See, e.g., Pelczynski v. Orange Lake Country Club, Inc.*, 284 F.R.D. 364, 368 (D.S.C. 2012) ("The standards of Rule 23 of the Federal Rules of Civil Procedure are inapplicable to § 216(b) collective actions"); *Simons v. Pryor's, Inc.*, No. 11-0792, 2011 WL 4345825 (D.S.C. Sept. 15, 2011) ("unlike in a class action under Rule 23 of the Federal Rules of Civil Procedure, the statute of limitations continues to run for members of an FLSA collective action until those members opt in.  This distinction between FLSA collective actions and Rule 23 class actions may partially explain why courts generally apply a less stringent standard to conditional certification of a collective action").

### 5.    Plaintiffs' Case Is Appropriate For Judicial Notice

The Supreme Court has held that the benefits to the judicial system of collective actions "depend upon employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." *Hoffmann-La Roche*, 493 U.S. at 170.  District courts are encouraged to become involved in the notice process early, to insure "timely, accurate, and informative" notice and to help maintain control of the litigation.  *Id.* at 171-72.  Short of a bright-line standard, the Supreme Court in *Hoffmann-La Roche* established that a court-approved notice to potential plaintiffs in FLSA collective actions is proper in "appropriate cases."  *Id.* at 169–70.  The case at bar is one such appropriate case.

Here, prompt judicial notice is needed because claims of the potential opt-in plaintiffs are being extinguished or diminished due to the running of the statute of limitations.  Unlike Rule 23 class actions, the statute of limitations in FLSA collective actions continues to run on each individual's claim – reducing the amount in damages an individual could recover – until the individual files a consent form with the Court.  Court-facilitated notice will prevent such erosion of claims while the parties work to resolve this litigation.

Further, judicial notice providing all entertainers the opportunity to pursue their claims in one forum will create the significant judicial economies recognized in *Hoffmann-La Roche*.  Indeed, because similar – if not identical – issues of law and fact exist amongst all of Defendant's entertainers, one action benefits the judicial system by resolving this case collectively at least through the discovery phase.  *Hoffmann-LaRoche*, 493 U.S. at 170.  Collective adjudication also avoids the proliferation of individual lawsuits that could result in disparate rulings and wasting of judicial and party resources.

Judicial notice is also necessary in this case because the size of the putative class remains unknown and Plaintiffs' best estimate is that the size of the class is greater than one hundred (100) individuals.  Given the potential scope of this class, word-of-mouth communications between the prospective collective class members and Plaintiffs or Plaintiffs' Counsel is an insufficient method of providing a truly adequate and fair notice.

### 6.     Plaintiffs' Proposed Judicial Notice Is Accurate, Informative, And Has Been Routinely Adopted

Plaintiffs' proposed judicial notice is attached as **<u>Exhibit 1</u>**.  As required, it is "timely, accurate, and informative."  *See Hoffmann-La Roche*, 493 U.S. at 172.  Plaintiffs' proposed notice is carefully drafted to mirror notice forms that other federal districts courts have approved in analogous cases.  As such, the proposed notice achieves the ultimate goal of providing

employees accurate and timely notice concerning the pendency of the collective action, and should be adopted.

### B.    Production Of A List Of Entertainers Is Necessary To Facilitate Notice

As discussed above, all entertainers employed by Defendant since March 1, 2012 are "similarly situated" employees within the meaning of Section 216(b) of the FLSA.  Disclosure of the names and contact information of those similarly situated is necessary in order for Plaintiffs to provide those individuals with notice of the action as contemplated by the law.  *See Hoffmann-La Roche*, 493 U.S. at 170;[15]  Accordingly, Plaintiffs respectfully request that, in addition to entering an order granting conditional certification and approving Plaintiffs' notice, the Court order Defendant to post notice of this suit in a conspicuous place at its North Myrtle Beach location and produce to Plaintiffs the following within ten (10) days of its order:

> A list, in electronic and importable format, of all persons who have worked in Defendant's North Myrtle Beach club as entertainers since March 1, 2012, including their name, job title, address, telephone number, dates of appearances, date of birth, and last four digits of their Social Security number.[16]

## IV.    CONCLUSION

Plaintiffs have offered significant factual proof that they and the putative opt-in class are similarly situated with respect to the claims in this lawsuit.   Plaintiffs respectfully request that this Court follow the well-established precedent from the United States Supreme Court and the Federal District Courts sitting within the Fourth Circuit –  particularly those in this District – and 1) promptly authorize this case to proceed as a collective action; 2) order the identification of all

---

[15] *Hoffmann-La Roche* recognizes that Plaintiffs in collective actions under the FLSA are entitled to the discovery of the names and addresses of co-workers regardless of whether judicial notice is appropriate.  *Id.* at 170.  In so ruling, the Court acknowledged the existence of "alternative bases for the discovery, for instance that the employees might have knowledge of other discoverable matter."  *Id.*

[16] Due to the transient nature of the business, the social security numbers are needed because the contact information Defendant has will likely be outdated.  The social security numbers will help in obtaining current contact information of putative class members.

entertainers who worked for Defendant during the applicable statutory period; and 3) authorize the issuance of Plaintiffs' proposed notice to be mailed to all potential opt-in plaintiffs worked in Defendant's club since March 1, 2012.

Dated:  December 17, 2014                                  Respectfully submitted,

                                                          By:  */s/ James L. Ward, Jr.*
                                                          James L. Ward, Jr.  (Fed I.D. 6956)
                                                          jward@rpwb.com
                                                          **Richardson, Patrick, Westbrook,**
                                                          **& Brickman, LLC**
                                                          P.O. Box 1007
                                                          Mt. Pleasant, SC 29465
                                                          (843) 727-6500

                                                          Gary F. Lynch
                                                          glynch@carlsonlynch.com
                                                          Edwin J. Kilpela, Jr.
                                                          ekilpela@carlsonlynch.com
                                                          Jamisen A. Etzel
                                                          jetzel@carlsonlynch.com
                                                          **Carlson  Lynch  Sweet  &  Kilpela,**
                                                          **LLP**
                                                          PNC Park
                                                          115 Federal Street, Suite 210
                                                          Pittsburgh, PA 15212
                                                          (412) 322-9243

                                                          *Counsel for Plaintiffs*