UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Alexis Degidio, individually and on behalf of all others similarly situated | ) ) ) | Civil Action No.: 4:13-cv-02136-BHH |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | **Opinion and Order** |
| Crazy Horse Saloon and Restaurant, Inc, d/b/a Thee New DollHouse | ) ) ) ) | |
| Defendant. | ) ) ) | |
| _____ | ) | |

This matter is before the Court on the plaintiff's motion for conditional class certification and judicial notice pursuant to 216(b) of the FLSA (ECF No. 70), a motion for class certification under Rule 23 (ECF No. 71), and the defendant's motion for summary judgment (ECF No. 102). The Court held a hearing on August 18, 2015, to consider the parties' arguments on these motions.[1] For the reasons set forth in this Order, the motion for conditional class certification and judicial notice is granted, the motion for class certification under Rule 23 is denied with leave to refile as provided herein, and the motion for summary judgment is denied in substantial part.

## BACKGROUND

The defendant, the Crazy Horse Saloon and Restaurant, Inc. d/b/a Thee New DollHouse, is a strip club in North Myrtle Beach, South Carolina (the "Club"). The Club describes itself as "an upscale gentlemen's club" offering "a first class experience,"

---

[1] These motions were considered alongside similar motions in a closely related case, *Gardner v. Galardi South Enterprises*, 4:13-cv-03399-BHH. The material facts in the *Galardi* case are similar to those in this case, and the Court's analysis here will also apply in *Galardi*.

complete with valet parking, "top champagnes, wines and liquors," and "4 elevated lighted stages" where "entertainers" perform exotic adult dancing. (Davenport Decl. ¶ 3.)[2] The Club also offers couches, Jacuzzis, and semi-private "VIP" areas, where entertainers can provide individualized services, such as "friction dances," for the Club's patrons, which it refers to as "guests." (*Id.*) The Club also serves food and alcohol and has 25 HDTVs featuring sports programing. (*Id.*)

The defendant has made substantial investments to create and maintain a "high class" atmosphere in the Club and to promote its business. The defendant pays for advertising through radio, magazines, and the internet, has hired an outside graphic artist to design its advertisements, and contracts with an outside company to manage the Club's official Facebook page. (Clark Dep. 36:3–16, 40:4–8, 72:10–24.) Since 2012, the defendant has invested over $1 million in remodeling and maintenance projects inside the club, and it planned to spend approximately $1.2 million to remodel the club's exterior in the winter of 2014-2015 (Watson Dep. 37:18–39:14; 135:19–137:1.) The defendant's total expenses related to the Club in 2013 were approximately $3.3–$3.4 million. (*Id.* 48:21–49:15.)

The Club classifies its entertainers as "lessees" or "independent contractors," who are permitted the non-exclusive use of the Club's stages, dressing room, lockers, and semi-private areas for performing. (Watson Decl. ¶ 2.) Consequently, the entertainers are not paid any wages by the Club, but receive tips from customers for their performances. In fact, entertainers are often required to pay a nightly "house fee" to the club in order to be able to dance there. House fees are an important source of

---

[2] The affidavits, declarations, depositions, and records cited in this order were filed as attachments to the parties' memoranda on these motions. (*See* ECF Nos. 70, 71, 72, 73, 80, 81, 102, and 107.)

revenue for the Club and are structured to encourage entertainers to arrive early in the evening to ensure that there are plenty of women dancing in the Club.  If entertainers arrive before 7:00 p.m. there is no House Fee. After 8:00 p.m. it is $20.00, after 9:00 p.m. it is $40.00, after 10:00 p.m. it is $60.00, after 11:00 p.m. it is $80.00, and after midnight it is $100.00.    (Davenport Decl. ¶ 8.)    The amounts charged may vary seasonally at the discretion of the Club's managers and consultant.  (Clark Dep. 58:16–59:9.)

In addition to drawing customers[3] and generating house fees, there are a number of other ways that the Club makes money from the entertainers.  First, the defendant offers guests who are light on cash artificial currency referred to as "Golden Dollars," which can only be used for tipping or buying private dances.  Guests pay a 10% fee to purchase Golden Dollars from the defendant. In addition, entertainers are required to pay the defendant a 10% fee in order to have the Golden Dollars they receive as payment from guests redeemed for U.S. currency.  (*See* Clark Dep. 64:23–66:22.)  The plaintiff emphasizes that while entertainers must submit whatever portion of their earnings they receive in Golden Dollars to the defendant for conversion, only the ten percent conversion fee is ever recorded in the defendant's gross receipts, and the record supports this contention.  (*See, e.g.*, Exs. C, D & E to Watson Decl, ECF No. 102–4, pp. 48–98.)

Second, the Club sets what it describes as minimum payment amounts for the various types of individualized services offered by its entertainers.  In the Club's "couch" areas, the Club charges $10.00 per song for use of the couch space and the entertainer

---

[3] The club charges guests cover fees based on the time of day.  The amount of the fee is determined by the defendant.  (Clark Dep. 98:15–24.)

charges a fee for the dance. The minimum listed by the Club is $30.00, which includes the $10.00 for use of the space.  There are VIP rooms where dancers can perform in increments of time starting with 15 minutes. The Club charges a fee for use of the VIP room as follows, $25.00 for 15 minutes, $50.00 for 30 minutes, and $100.00 for 60 minutes.  The Club minimums for dances in the VIP area are $150 for 15 minutes, $300 for 30 minutes, and $600 for 60 minutes.  These minimums include the room fees charged by the Club at $25 for 15 minutes, $50 for 30 minutes, and $100 for 60 minutes.  (*See* Ex. A to Davenport Decl.)  For example, if a patron wanted to purchase a 15 minute "couch" or "friction" dance at the minimum price, he would pay $30 with $20 dollars going directly to the dancer and $10 going to the Club.  Of course, if the patron paid with Golden Dollars, the club would collect an extra $3 (10%) from the patron in conversion fees and another $2 from the dancer (10%) when she traded in the Golden Dollars she was given for U.S. currency.

The defendant alleges that entertainers are free to charge more or less for their services, but the Club's use fees remain the same.  The plaintiff alleges that entertainers were not actually allowed to charge less than the Club's stated minimum for semi-private performances, and the general manager of the club testified that he has no knowledge of a dancer selling dances for less than the minimum prices. (*See* Davenport Dep. 50:6–8.)  An entertainer's ability to use the VIP rooms is practically limited by the space available, so if all the rooms are occupied, the entertainer and her patron might have to wait.  (Miller Dep. 89:15–90:2.)

Third, the Club uses the dancers in certain promotions during which it sells hats and T-shirts and offers reduced prices on private dances.  For these

promotions, entertainers line up and walk on stage with one of Thee New DollHouse's promotional items, and the DJ announces that customers may buy a two-song dance and the promotional item for $50. (Davenport Dep. 46:23–47:20; Callicutt Dep.171:15–172:18.)  The club takes a $30 cut of the promotional sales, representing 60% of the total price. (Callicutt Dep. 172:19–23.)  Jack Davenport, the general manager of the Club, offered the following testimony about two for one promotions:

> Q. So you decide when there's going to be a two for one and you tell the D.J.?
>
> A. No.  We have them approximately every hour on the week, but particularly when we're busy.  The only time that I would say something along those lines is when we're past that hour into 15 minutes past the hour.  Then I may say, hey, don't forget, you know, two for one time, that type of thing.
>
> Q. And then do all the dancers come up on stage during the two for one?
>
> A. They are supposed to.
>
> Q. They are supposed to?
>
> A. Yeah.
>
> Q. And –
>
> A. We encourage them to.
>
> Q. Right.  What would happen if a dancer was just sitting around not doing anything during the two for one?  Would you ever tell the dancer to go on stage?
>
> A. I would – if I saw someone not participating, I would say, you need to go upstairs now.
>
> Q. Okay.  So it is an expectation that unless they are doing something with a customer, that they will participate in the two for one.

A. We – we encourage them – everyone to – to participate in – in the two for ones

(Davenport Dep. 46:23–47:25.)

The Club does not have written rules for entertainers and claims that the only unwritten rules are those required by health, safety, and the law. The defendant makes this claim despite the fact that it sometimes has 60-80 entertainers working for it on a single night, (*see* Davenport Dep. 56:16-19; Clark Dep. 34:8-19, 39:6-17), and the fact that it claims to maintain a "high class" atmosphere that is "more like a show club than a strip club." A review of the facts and testimony quickly dispels any suggestion that the defendant is operating a laid back free-for-all without policies and procedures. While the defendant may characterize its rules and practices as "suggestions," "standards," "custom," "guidance," or "encouragement," the bottom line is that the defendant employs practices that are very similar to the "rules" imposed at other clubs and, to an extent that exceeds a lot of other clubs, tightly controls the atmosphere of its business. Finally, it is undisputed that the management of the Club has complete discretion to determine who can and cannot perform at the Club. (*See* Clark Dep. 43:6-12; Trowbridge Dep. 25:4-7.)

The Club claims that in addition to no rules for entertainers, there is no schedule either. The plaintiff disputes this claim, and argues that while scheduling is extremely flexible, the defendant does exert a measure of control in this area. The defendant has ultimate authority to control the shifts that entertainers are permitted to work, and has required certain entertainers to work the typically less lucrative daytime or happy hour shifts. (Hargadon Dep. 35:20–36:12 (if an entertainer is failing to live up to standards, the defendant "might put them on a day shift"); DeGidio Dep. 99:11–20 ("If they didn't think you were up to par, they would make you work on a happy hour."); Gardner Dep.8

66:17–69:9 ("The manager would tell you, 'You have to work a happy hour [shift] or you don't have a job,' and it's just what you had to do.").)

## DISCUSSION

**I.    MOTION FOR SUMMARY JUDGMENT**

### A. Standard of Review

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or  "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law.  As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a

7

reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Under this standard, the existence of a mere scintilla of evidence in support of the non-moving party's position is insufficient to withstand a summary judgment motion. *Anderson*, 477 U.S. at 252. Conclusory allegations or denials, without more, are likewise insufficient. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

Whether a worker is classified as an employee under the FLSA is a question of law. *See Purdham v. Fairfax County Sch. Bd.*, 637 F.3d 421, 428 (4th Cir. 2011); *Walton v. Greenbrier Ford, Inc.*, 370 F.3d 446, 450 (4th Cir. 2004). "Employee status can be determined by the district court on a motion for summary judgment where there are no genuine disputes of material fact," *Thompson v. Linda & A., Inc.*, 779 F. Supp. 2d 139, 147 (D.D.C. 2011). As will be discussed, numerous federal courts have recently issued decisions resolving similar cases on motions for summary judgment.

### B. Analysis
#### i. State Law Claims

The Court begins its analysis with the defendant's argument that the plaintiff's claims under the South Carolina Payment of Wages Act (SCPWA), S.C. Code 41-10-10 *et seq.*, are preempted by the FLSA. The resolution of this issue affects the Court's

analysis of class certification because certification under Rule 23 of the Federal Rules of Civil Procedure is only at issue if the state law claims are not preempted.

The Court begins "with the basic assumption that Congress did not intend to displace state law." *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 192 (4th Cir. 2007) (quotation marks and citations omitted). This presumption "is stronger still against preemption of state remedies, like tort recoveries, when no federal remedy exists." *Id.* (quotation marks and citations omitted). The plaintiff's complaint alleges that the defendant violated the entertainers rights under the SCPWA by "(i) failing to pay them the appropriate minimum wages for all hours worked; (ii) improperly denying them overtime wages for all hours worked in excess of forty hours in a workweek; and (iii) inappropriately withholding and/or deducting unlawful amounts from the gratuities of the SC Class." However, it does not appear that the SCPWA actually imposes a specific minimum wage or overtime rules. Rather, the Act governs the manner in which wages are paid, withheld, or disputed.

"Congress prescribed exclusive remedies in the FLSA for violations of its mandates," and state law claims are preempted where they "merely duplicate[]" FLSA claims. *Id.* at 194. This includes claims under the SCPWA that seek to recover minimum wages and overtime. *See Hudson v. City of Columbia,* No. 3:13–429, 2015 WL 337637, at *15 (D.S.C. Jan. 26, 2015); *Billioni v. Bryant*, 0:14-CV-03060-JMC, 2015 WL 4928999, at *10 (D.S.C. Aug. 18, 2015); *Void v. Orangeburg County Disabilities and Spec. Needs Bd.*, 5:14-CV-02157-JMC, 2015 WL 404247, at *5 (D.S.C. Jan. 29, 2015). Thus, to the extent that the plaintiff is alleging that the defendant violated her rights under the SCPWA by "failing to pay . . . appropriate minimum wages for all hours

worked" and "denying . . . overtime wages," those claims are preempted by the FLSA. The Court also finds that the common law claims for unjust enrichment are preempted because the plaintiff is essentially just "invok[ing] state law in order to enforce rights conferred under the FLSA." *Gutwirth v. Woodford Cedar Run Wildlife Refuge*, 38 F. Supp. 3d 485, 491 (D.N.J. 2014) (finding unjust enrichment claims under New Jersey law preempted by the FLSA). *C.f. Sauner v. Pub. Serv. Auth. of S. Carolina*, 581 S.E.2d 161, 167 (S.C. 2003) (listing the elements required to establish unjust enrichment under South Carolina law, which are almost identical to the elements required to establish unjust enrichment under New Jersey law).

The plaintiff also argues that she is entitled to recover "deductions" from tips she received under S.C. Code Ann. § 41-10-40. Specifically, the plaintiff alleges that:

> Due to Defendant's policy of deducting amounts from the tips of Plaintiff and the SC Class to offset business expenses, Plaintiff and the SC Class were subject to improper deductions from their compensation. Specifically, Defendant unlawfully withheld and diverted monies from the compensation earned by Plaintiff and the SC Class for business expenses of Defendant, including, but not limited to, the cost of employing other workers, in direct violation of the PWA.

(Am. Compl. at ¶ 83, ECF No. 42.) The plaintiff insists that this claim is not preempted by the FLSA. The Fourth Circuit recently held that the FLSA does not create an independent cause of action for the improper deduction of tips and only applies to the deduction of tips where the deduction contributes to a violation of the minimum wage or overtime provisions of the FLSA. *See Trejo v. Ryman Hospitality Properties, Inc.*, 795 F.3d 442, 448 (4th Cir. 2015).[4] Since the FLSA does not regulate claims for improper

---

[4] In *Trejo*, the Fourth Circuit observed that "§ 203(m) 'does not state freestanding *requirements* pertaining to all tipped employees,' but rather creates rights and obligations for employers attempting to use tips as a credit against the minimum wage." *Trejo*, 795 F.3d at 448 (citing *Cumbie v. Woody Woo, Inc.*, 596 F.3d 577, 581 (9th Cir. 2010)) (emphasis in original). The *Trejo* court also found that "the statutory

deductions except where the deductions create a minimum wage or overtime problem, the Court does not find that the FLSA preempts § 41-10-40, which may be applicable even where an employer is in compliance with the minimum wage and overtime provisions of the FLSA.

While § 41-10-40 is not necessarily preempted by the FLSA, the Court is not convinced that the plaintiff has stated a claim under that section, which provides:

> An employer shall not withhold or divert any portion of an employee's wages unless the employer is required or permitted to do so by state or federal law or the employer has given written notification to the employee of the amount and terms of the deductions as required by subsection (A) of § 41-10-30.

This provision does not specifically reference "tips," and tips are not included in the definition of "wages" found in § 41-10-10(2) ("Wages" means all amounts at which labor rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis, or other method of calculating the amount and includes vacation, holiday, and sick leave payments which are due to an employee under any employer policy or employment contract.  Funds placed in pension plans or profit sharing plans are not wages subject to this chapter.").

Thus, while the Court does not accept the defendant's preemption argument, it is sufficiently doubtful that § 41-10-30 applies to the facts alleged that it declines to conduct the Rule 23 analysis.  The Court invites the defendant to move for dismissal of the claim on substantive grounds, including the argument that the term wages in § 41-

---

requirements that an employer inform an employee of § 203(m) and permit the employee to retain all his tips unless the employee is in a tip pool with other regularly tipped employees does not apply to employees . . . who are seeking only the recovery of the tips unrelated to a minimum wage or overtime claim." *Id.*

10-40 does not include tips.[5]  Any such motion should be filed within thirty (30) days of

this order, and the plaintiff may respond thereafter.  If, after supplemental briefing, the

Court determines that the plaintiff has in fact stated a claim under § 41-10-40, then and

only then will the Court consider whether class certification is warranted under Rule 23.

Accordingly, the motion for class certification under Rule 23 is denied without prejudice

to the plaintiff's right to refile should she survive a motion to dismiss or should the

defendant fail to file such a motion.

### ii.  FLSA

The FLSA applies to employees, but not to independent contractors.  *Chao v.*

*Mid-A. Installation Services, Inc.*, 16 Fed. Appx. 104, 105 (4th Cir. 2001)(unpublished).

The Act defines the term "employ" as to "suffer or permit to work," 29 U.S.C. § 203(g),

and defines an "employee" as "any individual employed by an employer." 29 U.S.C. §§

203(e)(1).  "[R]ecognizing that broad coverage is essential to accomplish the goal of

outlawing from interstate commerce goods produced under conditions that fall below

minimum standards of decency," the Supreme Court "has consistently construed the Act

liberally to apply to the furthest reaches consistent with congressional direction."  *Tony*

---

[5] The defendant hints at this argument, citing a similar finding in *Hart*, where the District Court for the
Southern District of New York found in an analogous case that the plaintiff could not recover under a
provision of New York law similar to § 41-10-40 because the New York provision prohibited "only
improper 'deduction[s] *from the wages* of an employee,' and the plaintiffs were not paid wages at all."
967 F. Supp. 2d at 952 (emphasis in original).  Instead of making a similar argument, the defendant
concludes that the plaintiff must be relying "not upon a state wage law for the requested relief, but instead
upon the FLSA up to the amount of minimum wage."  (ECF No. 111 at 8.)  The Court does not
understand this to be the plaintiff's argument; indeed, the plaintiff goes to great lengths to emphasize that
all of the money that the plaintiff received from customers while working at the Club should be considered
"tips" and should not count toward the defendant's minimum wage and overtime obligations under FLSA if
the Court finds that the plaintiff is an employee.  While the Court is currently inclined to reject the state
claim for the reasons set forth in *Hart* (not preemption), the Court is hesitant to *sua sponte* dismiss a
cause of action for reasons that neither party has thoroughly briefed or addressed.

and Susan Alamo Found. v. Sec. of Lab., 471 U.S. 290, 296 (1985) (quotation marks and citations omitted); see also Benshoff v. City of Virginia Beach, 180 F.3d 136, 140 (4th Cir. 1999) (observing that the FLSA "should be broadly interpreted and applied" in light of its "remedial and humanitarian" purpose).

### a. Employee Status

"The determination of 'employee' status under the FLSA is a question of law, although it depends on subsidiary factual determinations. Employee status can be determined by the district court on a motion for summary judgment where there are no genuine disputes of material fact." Verma v. 3001 Castor, Inc., CIV.A. 13-3034, 2014 WL 2957453, at *5 (E.D. Pa. June 30, 2014) (quotation marks and citation omitted). That some or all of the workers in question express a desire to be classified as independent contractors and excluded from the Act is not dispositive. The Supreme Court explained that "the purposes of the Act require that it be applied even to those who would decline its protections" and reasoned that if an exception were available based on the representations of a protesting employee, employers would be incentivized "to use [their] superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act." Tony and Susan Alamo Found., 471 U.S. at 302. Such a practice would affect not only the workers at issue, but would "be likely to exert a general downward pressure on wages in competing businesses." Id.

A plaintiff seeking relief under the FLSA bears the initial burden of establishing the existence of "an employer-employee relationship," but once the plaintiff has done so, "the employer bears the burden of proving entitlement to any exemptions or exceptions to the Act's compensation requirements." Benshoff, 180 F.3d at 140. The

13

critical inquiry is "whether the worker is economically dependent on the business to which he renders service or is, as a matter of economic reality, in business for himself." *Schultz v. Capital Intern. Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006) (quotation marks, citation, and alteration omitted); *see also Brock v. Super. Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988) ("The ultimate concern is whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves.").  To make this determination, the Court applies a six-factor test that considers:

> (1) the degree of control that the putative employer has over the manner in which the work is performed;
> (2) the worker's opportunities for profit or loss dependent on his managerial skill;
> (3) the worker's investment in equipment or material, or his employment of other workers;
> (4) the degree of skill required for the work;
> (5) the permanence of the working relationship; and
> (6) the degree to which the services rendered are an integral part of the putative employer's business.

*Schultz v. Capital Intern. Sec., Inc.*, 466 F.3d 298, 304-05 (4th Cir. 2006); *see also Chao*, 16 Fed. Appx. at 106 (applying the same six-factor test).  No single factor is dispositive, *Schultz*, 466 F.3d at 305, and the Court must "look at the totality of the circumstances and consider any relevant evidence," *Morrison v. Intl. Programs Consortium, Inc.*, 253 F.3d 5, 11 (D.C. Cir. 2001).

While each case must be decided on its own facts, it is significant that the vast majority of the district courts (including those within the Fourth Circuit) to have considered whether exotic dancers are employees or independent contractors, have found them to be employees.  *See, e.g., Mason v. Fantasy, LLC*, 13-CV-02020-RM-KLM, 2015 WL 4512327, at *13 (D. Colo. July 27, 2015); *Henderson v. 1400 Northside*

*Drive, Inc.*, 1:13-CV-3767-TWT, 2015 WL 3823995, at *5 (N.D. Ga. June 19, 2015); *Verma v. 3001 Castor, Inc.*, CIV.A. 13-3034, 2014 WL 2957453, at *5 (E.D. Pa. June 30, 2014): *McFeeley v. Jackson St. Ent., LLC*, 47 F. Supp. 3d 260, 279 (D. Md. 2014) *Stevenson v. Great Am. Dream, Inc.*, 1:12-CV-3359-TWT, 2013 WL 6880921, at *6 (N.D. Ga. Dec. 31, 2013); *Hart v. Rick's Cabaret Int'l, Inc.,* 967 F. Supp. 2d 901, 912–13 (S.D.N.Y. 2013); *Collins v. Barney's Barn, Inc., et al.,* No. 4:12CV00685 SWW (E.D. Ark. Nov. 14, 2013); *Butler v. PP & G, Inc.*, CIV.A. WMN-13-430, 2013 WL 5964476, at *9 (D. Md. Nov. 7, 2013) *reconsideration denied,* CIV.A. WMN-13-430, 2014 WL 199001 (D. Md. Jan. 16, 2014); *Thornton v. Crazy Horse, Inc.,* No. 3:06–CV–00251–TMB, 2012 WL 2175753 (D. Alaska June 14, 2012); *Clincy v. Galardi S. Enters., Inc.,* 808 F. Supp. 2d 1326, 1343 (N.D. Ga. 2011); *Thompson v. Linda and A. Inc.,* 779 F. Supp. 2d 139, 151 (D.D.C. 2011); *Morse v. Mer Corp.,* 2010 WL 2346334, at *6 (S.D.Ind. 2010); *Harrell v. Diamond A Entm't Inc.,* 992 F. Supp. 1343, 1348 (M.D.Fla. 1997); *Reich v. Priba Corp.,* 890 F. Supp. 586, 594 (N.D.Tex. 1995); *Martin v. Priba Corp.,* 1992 WL 486911, at *5 (N.D.Tex. 1992); *see also Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 330 (5th Cir. 1993) (affirming district court's determination that exotic dancers were employees under the FLSA). *Cf. Matson v. 7455, Inc.,* No. 98–788, 2000 WL 1132110, at *4 (D.Or. Jan.14, 2000); *Hilborn v. Prime Time Club, Inc.,* No. 11–00197, 2012 WL 9187581, at *1 (E.D.Ark. July 12, 2012).

In contrast, the persuasive authority from analogous cases favoring the defendant is conspicuously thin, and includes a 15-year old decision from the District of Oregon (*Matson*), a two-page order from the Eastern District of Arkansas granting the defendant's seemingly unopposed motion for summary judgment, and a decision by the

South Carolina Court of Appeals classifying an exotic dancer as an independent contractor for the purposes of workers compensation, which was subsequently overturned by the South Carolina Supreme Court.  *See Lewis v. L.B. Dynasty, Inc.*, 732 S.E.2d 662, 663 (S.C. App. 2012) *rev'd sub nom. Lewis v. L.B. Dynasty*, 770 S.E.2d 393 (S.C. 2015).

## 1.  Degree Of Control

The parties dispute the extent to which the Club controls the behavior and work of its entertainers.  The defendants allege that entertainers are free to come and go as they like and there are virtually no rules except for those mandated by state and local laws.  (*See* ECF No. 102-1 at 7-8; Davenport Decl. ¶ 4, 16; Clark Decl. ¶ 6; Callicutt Dep. 166 – 171:14).   The defendant also points out that, unlike a number of other similar establishments, the Club does not impose fines on entertainers.  (ECF No. 102-1 at 7-9; Davenport Decl. ¶ 20; Callicutt Dep. 167:20-22; Hargadon Dep. 36:17-37:14).  Moreover, entertainers are allegedly permitted to eat meals, consume alcohol and smoke cigarettes, and talk on the telephone while in the Club, while employees are subject to rules limiting these activities. (Davenport Decl. ¶ 21.)

The plaintiff alleges that, in fact, the Club enforces a wide range of rules beyond those required by law, including but not limited to:

   i.   Dress code requirements
  ii.   Sign-in requirements,
 iii.   A sequence in which performers are to appear on stage,
  iv.   House fees,
   v.   Minimum prices for couch and VIP dances,
  vi.   Tip-sharing requirements,
 vii.   A requirement that entertainers consent to appearing on the Club's live webcast, and
viii.   Various policies intended to maintain a sense of class in the establishment.

While the defendant describes many of the practices that entertainers are "encouraged" to adhere to as "suggestions" or "custom," and while most of them do not appear to be written down, it is clear from the record that the defendant exerts significant control over numerous aspects of the entertainers' conduct and presentation at the Club.

### i.  Dress

Entertainers are responsible for the cost of clothing, makeup, hair, and nails, and the Club maintains high standards in these areas.  The plaintiff testified that entertainers were required to wear long, formal dresses, which could be purchased from the House Mom:

Q. And as a dancer, were you responsible for your own clothes?

A. You had to, you had to have a certain dress code, yes.  You had to have gowns to the ankle.  They had to be covered, but you know, and they enforced that dress code, and again, if you didn't have it, Lori charged you to buy one, and everybody else.  All girls had to buy dresses off of her, and, and if you didn't have them, you weren't allowed to work.

The following testimony from a number of the defendant's employees or agents confirms that the club had a demanding dress code:

Q. Does the club have a dress code?
A. As far as – yeah, we –

Q. The dancers?

A. I mean, we – we try to, you know, retain a[n] image as far as we like classy.  So we try to have classy dresses for the entertainers.  They look nice and stuff like that.

Q. When they're on the floor, they have to have a gown on, right?

A. There's a gown.  Yeah, we – that's what we ask for, yes.

(Hargadon Dep. 148:18 – 149:3.)

Q. Could I wear jeans? What if I wanted to wear jeans and dance?

A. No.

Q. Could you do that?

A. No. You do need to have a dress.

Q. So do you tell the girls that?

A. yes.

(Callicutt Dep. 121:23 – 122:4.)

The defendant's stringent dress code requirement appears to be integral to its strategy to market itself as a "classy" environment, a show club and not strip club.  As Brent Clark, who manages the Club's branding explained:

> There's many strip clubs in the United States.  As a show club, we'd like for our entertainers to present in a certain manner; i.e., nails done, hair done, makeup done, proper attire.  Proper attire to us is a – a nice evening gown or a dress that they can bring in and if it fits our format, they can wear it.  Or they have an opportunity to – to buy one on site.  Or they can go to one of three or four boutiques that specialize in entertainer wear.

It is clear from the testimony, that this concept has been communicated to the Club's management:

Q. Now, is it true that Thee Dollhouse has certain expectations about the way dancers will be dressed when they are at the club?

A. They do.

Q. What are those expectations?

A. That the – the criteria is we – we try to be a show club, not a strip club, and we try to have our – our entertainers in gowns and look appropriately, gloves, accessories, try to look as – as – as fine as they possibly can.

Q. High class?

A. High class would be a great word for it.

(Davenport Dep. 21:12-24).   Thus while entertainers are responsible for the cost of maintaining their appearance and acquiring the right clothing, the Club imposes rigorous standards that entertainers must meet.

### ii.  <u>Sign In</u>

The plaintiff contends that entertainers are required to sign in.  The record suggests that entertainers are supposed to sign in, but it is unclear as to whether the responsibility to do so is the on the entertainer or on the Club.

### iii.  <u>Sequence of Performance</u>

The defendant emphasizes that it does not dictate the manner in which the entertainers dance or entertain.  (*See* ECF No. 102-1 at 7 (Plaintiff . . . completely controlled *the final result of her work (i.e. how she physically performed her dances)*) (emphasis in original).)   However, the Club does control various aspects of an entertainer's performances, including the sequence, timing, and length of typical stage appearances (three songs). (Callicutt Dep. 162:22–163:9; Trowbridge Dep. 140:3–17; Miller Dep. 64:1–3.) The Club's D.J. controls the music played throughout the night, including during all stage performances. (Trowbridge Dep. 142:17–143:2; Callicutt Dep. 215:11–23.)  Finally, there does appear to be a traditional sequence of disrobing that is encouraged, which concludes with the entertainer removing her top for the last song in each three-song sequence.  (Miller Dep. 62:2-14.)

### iv.  **House Fees**

As discussed above, house fees are set by the Club and are mandatory for all entertainers.  The Club maintains a "back house" list, indicating which entertainers owe the Club money and the amount owed.

### v.  **Minimum Prices**

Whether the Club sets minimum prices for couch/friction and VIP dances is disputed, and there is evidence in the record going both ways.  It is clear that the Club affects the pricing through the fees it imposes on the entertainers for use of the couches, rooms, Jacuzzis, etc.  Whether it is characterized as a minimum price or a recommended price, the bottom line is that the Club influences the pricing of the various performances offered.

### vi.  **Tip-Sharing Requirements**

Entertainers at the Club are expected to tip Club personnel who work with them. Per the Club, the recommended or expected amounts are as follows: $10.00 to the House Mom; $10.00 to the DJ and $2.00 to each Floor Host.  (Davenport Decl. ¶ 12; Callicutt Dep. 157:14-161:2; Clark Dep. 45:14-46:10, 51:20-52:13).  The parties dispute whether these amounts were mandatory minimums or merely customary suggestions. (*Cf.* DeGidio Dep. 84:4–21; 91:1–3; 91:20–25; 92:25–93:18 Gardner Dep. 59:7–10; 62:12–22; 75:17–20 (claiming the tip outs were mandatory) *with* Davenport Decl. ¶ 12; Hensell Decl. ¶ 11; Callicutt Dep. 43:9–21, 157:14–161:2; Trowbridge Dep 45:8-49:8, 96:19–99:3 (claiming the tip outs were optional suggestions).)  While the consequences for failing to tip are disputed, it is clear from the record that tipping was expected and that the Club communicated the minimum expected amounts to the entertainers.

Davenport testified:

> Q. Is it true that dancers are expected to tip other people in the club?
>
> A. It is true.
>
> Q. And who are the people the dancers are expected to tip?
>
> A. It would be the house moms, D.J.'s and floor hosts.
>
> Q. And how much are they expected to tip those people?
>
> A. There's a two dollar minimum on the floor hosts and ten dollars on the house mom and the D.J.

(Davenport Dep. 17:10-21.)

Additionally, it was revealed during the deposition of Brent Clark that someone associated with the Club posted an advertisement on Facebook seeking dancers for the Club, which said "opportunities for free house fees and low *minimum* tip outs." (Clark Dep. 51:1-19 (emphasis added).) Thus, it is clear that the management of the Club, which has the power to determine who is and is not allowed to perform at the Club, is communicating to the entertainers that these tip out minimums are expected. Whether these minimums are technically "required" as opposed to "strongly encouraged and expected" is not ultimately material to an overall assessment of the amount of control the defendant asserts.

### vii.  Webcast.

The defendant has installed two webcams, which broadcast images from the Club over the internet at all times the Club is open. (*See* Callicutt Dep. 91:24–92:2.). One of these cameras is directed at the club's main stage, and the other shows a portion of the entertainers' dressing room. (Davenport Dep. 25:22–26:2; Clark Dep.

77:6–10.)  Any internet user may view the main stage through a link on the defendant's website for no charge.  (Watson Dep. 232:3–14.)    The use of these webcams is significant in that it demonstrates the control that the defendant exerts over the size and format of the plaintiff's audience.  An entertainer who does not want video images of her exotic dancing streamed across the internet must either avoid the dressing rooms and main stage, or find another place to work.

### viii.    Policies to Protect the Club's Image

Whether they are characterized as rules or suggestions, the Club undoubtedly maintains certain standards for the behavior of entertainers in an effort to maintain the "high-class" atmosphere and distinguish its "show girls" from "strippers."  Examples of prohibited/discouraged behaviors include chewing gum while on the floor, using a cell phone while on the floor, and walking with a drink in one's hand.  (*See* Hargadon Dep. 21:5-12 ("[W]e didn't want them chewing gum.  We didn't want them walking with cigarettes in their hand.  We didn't want them carrying a drink across . . . – across a room.  They should ask a floorman to carry it for them.  Things that would elevate the entertainer from being a stripper to an entertainer."); Trowbridge Dep. 134:17-23, 135:1-9, 136:10-15 ("Q. Can they chew gum when they're out on the floor?  A. We – we don't –we don't recommend chewing gum.  Q. Why? A. They – they – it looks tacky.  We try to, you know, fit an image . . . Q. How about cigarette smoking?  A. Cigarette – they just not walking around with a cigarette.  We try to tell them, you know – Q. Can they – A. – just keep that to a minimum.  Q. Okay.  Can they smoke in their dressing room?  A. There's no smoking upstairs. . . . Q. Can the dancers use their cell phones when they're

walking around?  A. We just – like I say, we just ask them not to.  Q. You ask – okay. A.

Yeah. To not –").)

The testimony of management suggests that they did not hesitate to address with

a dancer any behavior that they felt negatively affected the Club's brand.

> Q. And so if you saw something that did not conform with the image [of Thee Dollhouse], you would probably do something about it.  Right?
>
> A. Yes.
>
> Q. And that is something you do in fact do regularly.  Correct?
>
> A. As needed.
>
> Q. So for instance, if a – if a dancer was consistently failing to dress or present herself in the way of Thee Dollhouse image, what would you do to correct that situation?
>
> A. My first move would be to talk to the entertainer, either that and point out how important it is to me that she do that, or I may go to the house mom and say that this individual needs to upgrade her appearance; can it be done?

(Davenport Dep. 63:4-19.)  The testimony further indicates that when Michael J. Peters

took over as a significant owner of the club, he heightened the standards for

appearance and conduct:

> [W]hen Michael became more prominent – had a more prominent role in the club, he wanted the dress code to be more stringent, more tight.  I allowed cocktails dresses, and I allowed the entertainers to change into whatever they wanted after two a.m. in the morning.  He didn't want that. He wanted them all in dresses or long gowns. . . . And you know, again, I wasn't a – if I – if a girl was chewing gum, I mean, I wouldn't make a big deal out of it as long as she wasn't doing it on stage.  That ended.

It is apparent from the record that the Club's high standards for appearance and

conduct were communicated to the entertainers as a requirement for continued

performance at Thee Dollhouse.

> Q. [I]s it safe to say that – I don't know – based on your experience, the women that worked as entertainers at Thee Dollhouse understood that living up to the Michael J. Peter show standard was something they needed to do if they wanted to continue working there.
>
> A. Yes.
>
> Q. And part of your job and Brent's job was making sure they were living up to that standard.
>
> A. Yes.

(Hargadon Dep. 38:19 – 39:5.)

Other courts faced with similar cases have indicated that an assessment of the degree of control that a defendant strip club asserts is not limited to an evaluation of how many rules it has, whether the rules are in writing, and whether the rules are enforced. *See, e.g., Hart*, 967 F. Supp. 2d at 918 (S.D.N.Y. 2013) (finding that, even after it did away with written rules for its exotic dancers, the defendant "continued to exercise significant control over [them]"). Instead, "courts considering the status of exotic dancers under the FLSA generally look not only to the guidelines set by the club regarding the entertainers' performances and behavior, but also to the club's control over the atmosphere and clientele." *Butler*, 2013 WL 5964476, at *3; *see also McFeeley*, 47 F. Supp. 3d at 269 (observing that the defendants' control over "the clubs' atmospheres," "advertising and day-to-day operations" weighed in favor of finding control); *Hart*, 967 F. Supp. 2d at 918 ("The Club's control of the overall operations of Rick's NY is strong evidence of the Club's control over the means by which dancers could make money from customers.").

Regardless of how its policies and procedures are characterized, it is clear from the record that the defendant not only runs a strip club with business practices very

similar to the strip clubs discussed in the analogous authority cited herein, but also maintains a very specific, "high class" atmosphere that it uses to distinguish itself from the competition.  That the defendant has not found it necessary to issue written rules in order to maintain this ambiance does not change the fact that the defendant tightly controls the atmosphere of the Club.  If a particular entertainer is detracting from that atmosphere through her appearance, behavior, or failure to follow the Club's protocols, she can be reprimanded, given undesirable hours, taken off the schedule temporarily, or simply told not to come back.  Given the subjective nature of the primary qualification for working at the Club as an entertainer – being physically attractive – the defendant's management has tremendous discretion in deciding who is allowed to perform when. Under such circumstances, the distinction between "rules" and "suggestions" is thin. Such a distinction is of limited value when the Court is assessing the overall level of control the defendant exercises and is immaterial to the outcome when factored into the totality of the economic realities test.  Thus, the Court finds that the defendant exerts sufficient control over its entertainers for the first factor to weigh in favor of classifying them as employees.

## 2.  Opportunities For Profit Or Loss

The record reflects that entertainers do not have managerial authority at the Club.  They do not hire, fire, or oversee any of the employees or other entertainers. They do not have the ability to set rules or procedures for the club.  They do not control who the Club admits, the food and alcohol it serves, the music it plays, the forms of payment it accepts, its lighting, décor, layout or operating hours.  While there is some evidence that entertainers have the ability to negotiate prices for individual services, they do not control the prices that the Club "recommends" to customers for such

services, the price of merchandize or two-for-one specials, the price of food or alcohol, cover charges, house fees, or the recommended tip outs to the DJ, floormen, house mom, etc.  The plaintiff's opportunities for profit and loss, while perhaps larger than they might be in other unskilled jobs, are still very small compared to the defendant's opportunities for profit.

The defendant argues that entertainers have the opportunity to make money or lose money based on how hard they work and how desirable they are to the Club's customers.  However, the argument "that dancers can 'hustle' to increase their profits" has "been almost universally rejected."  *McFeeley, LLC*, 47 F. Supp. at 270.  Moreover, in factually similar instances, courts have found that exotic dancers have relatively minimal opportunities for profit or loss, particularly when compared to those who operate the clubs in which they dance.  *See, e.g., Hart*, 967 F. Supp. 2d at 920 (reasoning that in light of the defendant's "control over most critical determinants of the number of customers who visited the Club on any given night or over time, the Club exercised a high degree of control over a dancer's opportunity for profit"); *Butler*, 2013 WL 5964476, at *4 (finding that the fact that entertainers lacked the opportunity to share in the profits or losses of the business favored classifying them as employees).  The second factor weighs in favor of finding an employer-employee relationship.

### 3.  Investment

While individual entertainers are required to cover the cost of their clothing, cosmetics, etc., their investment in these items is miniscule compared to the defendant's investment in the Club.  Again, courts in analogous cases have determined that this factor favors a finding that exotic dancers are employees.  *See, e.g., Reich*, 998 F.2d at 324-28 ("A dancer's investment in costumes and a padlock is relatively

26

minor to the considerable investment Circle C has in operating a nightclub."); *McFeeley*, 47 F. Supp. 3d at 271 (The "undisputed facts show that Defendants investment in the clubs greatly exceeded Plaintiffs' investment. Aside from the dancers providing their own work apparel and occasional food and decorations for events, Plaintiffs did not invest in the exotic dance clubs."). The third factor weighs in favor of finding an employer-employee relationship.

### 4.  Degree Of Skill Required For The Work

To be able to perform at the club, an entertainer must first audition for one of the Club's managers. While the Club maintains that the audition process is "highly selective" and is based on physical appearance, personality, and overall ability to entertain, (*see* Davenport Decl. ¶ 7), the record indicates that the significant majority of those who audition are hired. (Davenport Dep. 14:3–6 (estimating 70% are accepted); Trowbridge Dep. 25:23–26:14 (estimating 80% are accepted).) Moreover, it appears that physical appearance is the most important consideration. (Davenport Dep. 13:19–24 ("Q: [W]hat are you most concerned about when you are watching the audition? What factors are you considering? A: Appearance, primarily, obviously, and then of course their personality. But it's – it's generally just appearance.");Trowbridge Dep. 25:14–19; Callicutt Dep. 77:17–22, 82:21–23 (Q: So they are basically just presenting their bodies for inspection? A: Correct.").) Indeed, the primary factor used by Club managers to evaluate whether a woman will be hired as an entertainer is her appearance, not her dancing ability or artistic skill, (Davenport Dep. 13:19–24; Trowbridge Dep. 25:14–19; Callicutt Dep. 77:17–22, 82:21–23), and the defendant does not require applicants to have any training or skill to become entertainers. (Callicutt

Dep. 28:21–29:1).  For an attractive young woman, it appears the only qualification required is a willingness to take one's clothes off.  (*See* Callicutt Dep. 29:5–21).  Like others, this Court declines to characterize this as a "skill."  *See, e.g., Mason*, 2015 WL 4512327, at *10 ("Courts have held that there is little to no skill required to be a nude dancer."); *Stevenson*, 2013 WL 6880921, at *5 ("Taking your clothes off on a nightclub stage and dancing provocatively are not the kinds of special skills that suggest independent contractor status.").  The fourth factor weighs in favor of finding an employer-employee relationship.

### 5. <u>Permanence Of The Working Relationship</u>

Both parties appear to acknowledge that exotic dancers tend to be somewhat transient and often work at multiple places or move from one city to another depending on the season.  The defendant alleges that entertainers are not restricted from performing at other adult night clubs, holding down other jobs, or attending school.  (Davenport Decl. ¶ 17; Hensell Decl. ¶ 8; Clark Decl. ¶ 7.)  Conversely, the plaintiff claims that the Club does not permit its locally-based entertainers to perform at other clubs in the area, and the record indicates that she did not perform at other clubs while working at Thee New Dollhouse.  (DeGidio Dep. 47:3–24; Gardner Dep. 11:20–12:14; Hargadon Dep. 95:8–25.)  Either way, the Court finds that the relationships are less permanent than those in most employment settings.  While this factor favors the defendant's argument that the entertainers are independent contractors, the Court notes that transitory working relationships are not a factor that is unique to the defendant's entertainers, but are a common feature of the industry.  More importantly, this feature of the relationship has not prevented other courts from discounting this factor and finding

that exotic dancers are employees in almost every similar case.  *See, e.g., Mason*, 2015 WL 4512327, at *10 ("[T]he Court gives this factor, based upon the profession at issue in this matter, only limited weight in comparison with the other factors considered under the economic realities test."); *McFeeley*, 47 F. Supp. 3d at 272-73 ("The lack of permanence in the relationship between the clubs and the dancers is not outcome determinative in the overall determination of whether the dancers were employees of the clubs."); *Stevenson*, 2013 WL 6880921, at *5 (The lack of permanence "alone cannot nudge the Plaintiffs out of the protective sphere of the FLSA.").  The fifth factor weighs against finding an employer-employee relationship, but, like others, this Court affords the factor only limited weight.

### 6. Degree To Which Services Rendered Are An Integral To Putative Employer's Business

While the parties dispute whether the Club could survive without exotic dancers, it is clear from the record that the presence of scantily clothed women and topless dancing is a major draw for the Club.  (*See* Watson Dep. 136:11 – 137:1 ("Q. So there's a lot of thought, a lot of capital being contributed to making this happen in terms of a business that's . . . [g]eared towards the provision of adult entertainment services.  A. Correct. Q. That's what this is? A. Yes. Q. That's the primary business line of this business. A. Yes."), 140:16-22 (A. . . . [P]eople are walking in the building.  Because we're in a – chances are they're not just walking in the building to have a beer. Chances are they're coming in to see topless young ladies. Q. Because that's the business you're in? A. Correct.").)

On the other hand, Michael J. Peter, who owns a substantial interest in the Club, testified that even if the Club had no entertainers, it would still survive because they are

"in the nightclub business" and he has all kinds of other attractions, including liquor, food, televisions that attract numerous sports fans, and other shows that can be performed.  Nevertheless, he admitted that the club at issue in this case has never operated at its current location without exotic dancers. (Peter Dep. 118:22-25, 119-120, 121:3–14.)

Courts that have considered this factor in similar cases have scoffed at the idea that exotic dancers are anything less than integral to "gentlemen's clubs."  *See Verma*, 2014 WL 2957453, at *10 ("Given that Defendant markets itself on the basis of providing topless dancers, it cannot credibly argue that the services performed by dancers are not an integral part of its business.") *Butler*, 2013 WL 5964476, at *5 ("[A]ny contention that the exotic dancers were not integral to the operation of Norma Jean's flies in the face of logic."); *Hart*, 967 F. Supp. 2d at 921 (S.D.N.Y. 2013) ("No reasonable jury could conclude that exotic dancers were not integral to the success of a club that marketed itself as a club for exotic dancers.").  This Court finds the suggestion similarly ridiculous.  The sixth factor weighs in favor of finding an employer-employee relationship.

### 7.  Consideration of All Factors

As set forth above, factors one, two, three, four, and six support classifying the defendant's exotic dancers as employees as opposed to independent contractors.  Like the vast majority of other courts to have considered this question, the Court finds that the defendant's entertainers are employees who are entitled to the protections of the FLSA.  While the Court acknowledges that there are some differences between the defendant and other strip clubs in terms of their use of written rules, fines, and policies

intended to control the behavior of dancers, many of these differences are simply semantic. Moreover, even if the Court were to find that the defendant exercised less control over its dancers than the clubs in similar cases, the Court would still find that, taken together, the factors overwhelmingly favor classifying the plaintiff as an employee. Thus, while there are a number of factual disputes between the parties, the Court does not find them to be material. Accordingly, the Court finds that the defendant's entertainers are employees under the FLSA.

### b. Not Properly Compensated

"[A]n employee who brings suit . . . for unpaid minimum wages . . . has the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 686–87 (1946), superceded by statute on other grounds, Portal–to–Portal Act of 1947, Pub.L. No. 49–52, § 5, 61 Stat. 84, 87 (May 14, 1947) (codified at 29 U.S.C. § 216(b)). As the Fourth Circuit has noted, "[t]he regulations implementing the FLSA mandate that the employer keep records of the '[h]ours worked each workday' by all employees." *Lee v. Vance Exec. Protec., Inc.*, 7 Fed. Appx. 160, 165-66 (4th Cir. 2001)(unpublished) (quoting 29 C.F.R. § 516.2(a)(7) (2000)). Where an employer fails to fulfill its obligation to keep adequate records, an employee may meet his burden "if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson*, 328 U.S. at 687. Upon such a showing, the "burden shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.* at 687-88.

It is undisputed that the defendant did not pay the plaintiff or any of the other dancers any wages for their services at the Club. (ECF No. 102-2 at ¶ 51.) The Club did not maintain records showing the number of hours its entertainers worked each day, but apparently did keep a list of which entertainers showed up on which nights. This list shows the plaintiff's stage name, "Bella," on 40 different occasions. (*See* Ex. A. to Watson Decl. at 6-46, ECF No. 102-4.) The defendant's records show that the plaintiff's average sign in time was 8:35 p.m., and she testified that she typically worked until somewhere between 3:00 a.m. and 6:00 a.m. (Degidio Dep. 126:19 – 127:3.) While the plaintiff does not have her own records or a precise recollection of all of her hours, the Court finds that, in light of the defendant's failure to maintain records of its employees hours, these estimates are sufficient to satisfy her burden to show that the defendant did not adequately compensate her for her work.

Having carried her burden to establish roughly the amount of uncompensated work she performed, the burden shifts to the defendant to show the precise amount of work the plaintiff performed or to negate the reasonableness of the plaintiff's calculations. As noted, the defendant does not have precise records. Nevertheless, it argues that the Court should not accept the claim that the plaintiff worked 40 times based on the defendant's sign in sheet, but should instead assume that the plaintiff worked on only 21 occasions when the defendant's records indicate that the she was paid in Golden Dollars. (Watson Decl. ¶ 9.) Looking exclusively at the 21 instances for which it has payment records, the defendant argues that on each of these occasions the money the plaintiff received from individualized services exceeds what she would have made had she been paid minimum wage.

Setting aside for the moment the issue of whether these earnings can actually be used to offset the defendant's obligation to pay minimum wage, the Court is puzzled by the defendant's insistence that it should assume that the plaintiff only worked in instances where Golden Dollar transactions indicate that she made money.  The records of these transactions would not capture nights where the plaintiff was paid exclusively in cash or where she failed to make any money.  There is a strange circularity to the defendant's argument: you can't prove that you ever worked without making money because the only evidence sufficient to prove that you worked is a record that you made money.  The defendant offers no explanation for why the plaintiff's name would be on the sign in sheet when she was not working, but characterizes the record as showing only that "some unidentified person sign[ed] her in approximately forty times."  (ECF No. 111 at 9.)  For the Court to allow the defendant to use the unreliability of its own records to undermine the plaintiff's case seems at odds with the principles set forth in *Anderson v. Mt. Clemens Pottery Co.*  The Court finds that the plaintiff has presented evidence that supports a reasonable inference that the plaintiff worked at the Club on 40 occasions for periods that averaged between 6.5 and 9.5 hours per shift.

Assuming that the defendant would be entitled to deduct the money paid to the plaintiff by patrons from its minimum wage obligations, there would still be approximately 19 instances where it appears that plaintiff worked, but the defendant cannot prove that she made any money.  Moreover, given the expectation that the plaintiff tip and pay house fees, it is possible that there were occasions among the 21 instances where defendant's records show that the plaintiff was paid where she actually

ended up walking away with little or no money.  The plaintiff has satisfied her burden to show that she was not properly compensated, and the defendant has failed to provide evidence of the precise amount of work performed or evidence negating the reasonableness of the plaintiff's proof.

Furthermore, the defendant's entire argument that plaintiff was properly compensated rests on a faulty premise – that regardless of how, when, why, or by whom the plaintiff was paid, as long as the total amount of money that the plaintiff made while dancing at the Club equals or exceeds the amount of money she would have made had she been paid minimum wage, she has no claim under the FLSA.  As will be discussed in greater detail below, that is clearly not the law.  Indeed, if that were the law, one would expect that it would have precluded liability in more than a dozen cases where courts have found in favor of similarly situated plaintiffs.  The defendant's establishment is not unique in the fact that it is possible for dancers to make thousands of dollars in a single night in the form of tips.  However, as explained below, except under limited circumstances that are not applicable here, tips do not offset an employer's obligation to pay minimum wage.

## 1.  Tips

To the extent that the defendant is arguing that the plaintiff was not undercompensated because she made more than minimum wage through tips, the argument must be rejected.   "[Section] 203(m) permits an employer, in certain circumstances, to take a credit against the minimum wage by using an employees' tips as 'wages.'  An employer can thus pay tipped employees (1) a cash wage of $2.13 plus (2) an additional amount in tips that brings the total wage to the federal minimum wage." *Trejo*, 795 F.3d at 447.  However, § 203(m) does not apply unless the employee "has

been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips." 29 U.S.C. § 203.

In this case, the defendant cannot show that the plaintiff received the required $2.13 per hour or that the money she earned in tips always added up to at least minimum wage on the occasions she worked. There is also no evidence that the defendant advised the plaintiff that it would be using her tips to meet its minimum wage obligations pursuant to § 203(m). Finally, the Court is doubtful that the tip sharing arrangements described in the record would qualify as "the pooling of tips among employees who customarily and regularly receive tips."

## 2. Service Fees

The defendant argues that the money paid by customers to the dancers for couch dances, VIP dances, and Jacuzzi dances should be characterized as "service fees" that can be used to offset the defendant's obligation to pay minimum wage. 29 C.F.R. § 531.55 provides in relevant part:

> (a) A compulsory charge for service, such as 15 percent of the amount of the bill, imposed on a customer by an employer's establishment, is not a tip and, even if distributed by the employer to its employees, cannot be counted as a tip received in applying the provisions of section 3(m) and 3(t).

> (b) . . . service charges and other similar sums which become part of the employer's gross receipts are not tips for the purposes of the Act. Where such sums are distributed by the employer to its employees, however, they may be used in their entirety to satisfy the monetary requirements of the Act.

*Id.*

35

In *Hart*, the Court found that the fees paid to dancers for various categories of individual services should not be considered "service charges." The court reasoned that "if inclusion of payments in gross receipts entitles an employer to treat those payments as service charges, it is reasonable to treat exclusion of payments from gross receipts as indicating that they are not service charges." *Hart*, 967 F. Supp. 2d at 929. The court also noted that the "regulations require that service charges be distributed *by the employer* in order to count toward wages," implying "that such services charges are to be distributed by the employer out of its gross receipts." *Id. (emphasis in original).* Additionally, the *Hart* court identified several practical and policy considerations that weighed in favor of such an interpretation. First, requiring service fees to have been included in gross receipts "advances the FLSA's goal of assuring that the employee is paid, with mandatory deductions taken from the employee's wages." Second, the absence of such a rule "create[s] intolerable problems of proof" making it very difficult to determine whether the employer has actually met its minimum wage obligations. *Id.* Other courts outside of New York have also followed the rule set forth in *Hart*. *See Geter v. Galardi S. Enterprises, Inc.*, 14-21896-CIV, 2015 WL 2384068, at *5 (S.D. Fla. May 19, 2015); *Henderson*, 2015 WL 3823995, at *4.

The Court finds the rule applied in *Hart* to be sensible and consistent with the language of 29 C.F.R. § 531.55. Even if the regulation is not interpreted as requiring that money counted as a service charge be included in the employer's gross receipts, it clearly requires that the money be "distributed by the employer to its employees," which is not what is alleged here. The defendant's Statement of Undisputed Material Facts contains the following assertion: "Entertainers receive not only tips directly from the

Club's customers, but also are compensated with service charges which *they set with their customers* for couch dances and private dances in the Club's VIP areas."  This is not a "*compulsory* charge for service . . . *imposed* on a customer *by an employer's establishment*."  It is (according to the defendant) a *negotiable* charge *agreed to* by the customer and the *employee*.  An additional example of a service charge provided in 29 C.F.R. § 531.55(a) is "where negotiations between a hotel and a customer for banquet facilities include amounts for distribution to employees of the hotel, the amounts so distributed are not counted as tips received."  Thus, to the extent that there is negotiation over the amount of a service charge, the regulation contemplates negotiation between the customer and the employer, not the customer and the employee.

A number of other courts have applied a multi-factored test, in which the issue of whether the payment was included in the employer's gross receipts is one of several factors to be considered.  *See, e.g., Thornton*, 2012 WL 2175753, at *9 (considering "(a) whether the payment was made by a customer who has received a personal service; (b) whether the payment was made voluntarily in an amount and to a person designated by the customer; (c) whether the tip is regarded as the employee's property; (d) the method of distributing the payment; (e) the customer's understanding of the payment; and (f) whether the employer included the payment in its gross receipts" (quotation marks and citation omitted)).  Given the analysis above, the Court does not find it necessary to consider all of these factors.  However, the Court notes that those courts who have applied such multi-factored tests in analogous cases have characterized payments similar to those at issue here as "tips" that could not be used to offset minimum wage

obligations. *See id.* at *10; *Reich v. Priba Corp.*, 890 F. Supp. 586, 594-95 (N.D. Tex. 1995); *Reich v. ABC/York-Estes Corp.*, 1997 WL 264379, at *7 (N.D. Ill. May 12, 1997).

The defendant cites a few cases where it claims that courts have held that payments could be considered service charges even if they were not included in gross receipts. The Court finds the cases to be distinguishable or unpersuasive. The first is *Matson*[6], the 2000 ruling from the District of Oregon, which, as the Court has noted, is at odds with the vast majority of analogous cases decided in the last fifteen years. The defendant also cites *Ruffin v. Ent. of the E. Panhandle*, 845 F. Supp. 2d 762, 768-69 (N.D.W. Va. 2011), and subsequent orders issued in that case. *See* 3:11-CV-19, 2012 WL 761658 (N.D.W. Va. Mar. 7, 2012) *on reconsideration in part,* 3:11-CV-19, 2012 WL 1435674 (N.D.W. Va. Apr. 25, 2012). *Ruffin* suggests that payments could qualify as service fees without being taken into the defendant's gross receipts, but it was decided before *Hart* and it did not provide a substantive explanation for the rule. Instead, it relied almost entirely on *Doe v. Cin–Lan, Inc.,* 2010 WL 726710 (E.D.Mich. February 24, 2010), another case the defendant cites. The Court has carefully reviewed *Doe*, and finds it to be distinguishable.

In *Doe*, as in *Ruffin*, the defendant, an exotic dance club, had counterclaimed against the dancer bringing the suit, advancing claims for breach of contract and unjust enrichment and seeking an accounting. The defendant alleged that the dancer was permitted to keep fees the club charged for her dances pursuant to a written agreement with the defendant in which the plaintiff opted to be treated as an independent contractor instead of an employee. The plaintiff moved to dismiss the counterclaim,

---

[6] *See.* 2000 WL 1132110, at *5-6.

arguing, among other things, that the defendant was not entitled to offset her claims for minimum wage with money she received for individual services because the money had not been taken into the defendant's gross receipts and therefore could not be considered a service fee.  The district court responded, "[the plaintiff's] argument aims at defeating a claim [the defendant] is not making in its counterclaim, i.e., whether it may ultimately pay [the plaintiff] a reduced minimum wage."  *Doe,* 2010 WL 726710, at *6.  As the court saw it, the defendant's counterclaim was not *we don't have to pay you minimum wage because of this offset,* but rather, *if you are an employee, we may have to pay you minimum wage, but you will owe us money that you were paid pursuant to a contract that was contingent on your status as an independent contractor.*[7]

The *Doe* court went on to say, "even were the dance fees to have been required to enter into [the defendant's] gross receipts in order for [the defendant] to seek their return . . . the Court must assume, on a motion to dismiss, that the fees *did in fact enter into [the defendant's] gross receipts*," and that such an assumption was "reasonable given the existence of sample receipts, attached [by the defendant] to its counterclaim, which seem to demonstrate that [the defendant] *did in fact account for [the plaintiff's] nightly receipt of dance fees.*"  *Id.* (emphasis added). Thus, the motion at hand is clearly distinguishable – the defendant has not advanced counterclaims, there does not appear to be any written contract between the parties governing the plaintiff's employment, and the defendant has not offered any evidence to suggest that it accounted for the plaintiff's nightly receipt of dance fees.  *Doe* does not actually stand for the proposition for which it is cited, and the Court finds the defendant's argument unpersuasive. Accordingly, the Court finds that the defendant is not entitled to offset its obligation to

---

[7] This Court does not intend to suggest that it thinks such a contract would be enforceable.

pay minimum wage with the money customers paid to the entertainers for individual services.

### 3.  Overtime

The defendant alleges that the plaintiff cannot establish an overtime violation because she cannot prove that she ever worked more than 40 hours in a single week. After reviewing the records, the Court finds that there was at least one week where the plaintiff worked five out of seven days, and that this is sufficient to create a genuine issue of material fact regarding whether or not the plaintiff was entitled to overtime payments.

### II.    MOTION FOR CLASS CERTIFICATION PURSUANT TO 216(B)

#### A.  Legal Standard

Section 216(b) of the FLSA provides that an action for violation of its minimum wage or overtime provisions "may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves *and other employees similarly situated.*"  29 U.S.C. § 216(b) (emphasis added).   Special rules apply to class membership in the FLSA context:

> [U]nlike in a class action filed pursuant to Federal Rule of Civil Procedure 23 or a comparable state court rule, in a collective action under the FLSA, a named plaintiff represents only himself until a similarly-situated employee opts in as a "party plaintiff" by giving "his consent in writing to become such a party and such consent is filed in the court in which such action is brought."

*Simmons v. United Mortg. and Loan Inv., LLC*, 634 F.3d 754, 758 (4th Cir. 2011) (quoting 29 U.S.C. § 216(b)).   The Supreme Court has held that "district courts have discretion, in appropriate cases, to implement 29 U.S.C. § 216(b) . . . by facilitating

notice to potential plaintiffs." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989). A review of FLSA cases reveals that courts routinely grant conditional collective action certification to provide notice to potential opt-in plaintiffs.

Class certification in FLSA cases typically proceeds in two stages: (1) notice, and (2) a motion for decertification. *See, e.g., Purdham v. Fairfax County Pub. Schools*, 629 F. Supp. 2d 544, 547-48 (E.D. Va. 2009). Plaintiffs routinely seek judicial notice relatively early in FLSA litigation before the parties have conducted considerable discovery. This is likely due in no small part to the fact that opting in tolls the statute of limitations. *See Hoffmann-La Roche Inc.*, 493 U.S. at 169.

The plaintiff's burden at the first stage is minimal; the court need only be able to determine, based on the pleadings and any affidavits submitted, that the putative class members are "similarly situated." *See, e.g., Allen v. Cogent Commc'ns, Inc.*, No. 14-459, 2014 WL 4270077, at *3 (E.D. Va. Aug. 28, 2014) ("The plaintiff's evidentiary burden at this [first] stage is fairly lenient and requires only minimal evidence since generally there has been no discovery at this point." (quotation marks and citation omitted)); *Visco v. Aiken Cnty., S.C.*, 974 F. Supp. 2d 908, 915 (D.S.C. 2013) ("To demonstrate that other potential plaintiffs are similarly situated to him, a plaintiff must make only a modest factual showing sufficient to demonstrate that he and potential plaintiffs together were victims of a common policy or plan that violated the law."); *Curtis v. Time Warner Entm't-Advance/Newhouse P'ship*, No. 12-2370, 2013 WL 1874848, *2 (D.S.C. May 3, 2013) ("The plaintiff bears a low standard of proof at this [first] stage because the district court is simply determining whether similarly situated plaintiffs do in fact exist." (quotation marks and alterations omitted)).

Once the plaintiff satisfies this minimal burden, a court will approve a notice, which is sent to potential class members advising them of the opportunity to opt in. If, after discovery, the defendant believes that the proposed class is not similarly situated, it may file a motion to decertify the class. In this second stage, the Court will revisit the question of whether the members of the proposed class are similarly situated with the benefit of evidence the parties have obtained in discovery. In evaluating whether to grant a defendant's motion to decertify a class, courts consider, "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Rawls v. Augustine Home Health Care, Inc.*, 244 F.R.D. 298, 300 (D. Md. 2007).

Numerous courts have found that a plaintiff's showing that employees were subject to a common practice of misclassification is sufficient to show that employees are similarly situated. *See, e.g., Montoya v. S.C.C.P. Painting Contractors, Inc.*, No. 07-455, 2008 WL 554114, at *3 (D. Md. Feb. 26, 2008) ("the potential misclassification of the plaintiffs, in violation of FLSA's mandate that 'employee' be interpreted broadly, could be enough for class certification"); *Houston v. URS Corp.*, 591 F. Supp. 2d 827, 833-34 (E.D. Va. 2008) (finding that "Plaintiffs have sufficiently alleged a common policy or plan in that all inspectors were classified as independent contractors rather than employees"). Moreover, the Court notes that the vast majority of district courts in similar cases involving exotic dancers have granted conditional class certification. *See Espinoza v. Galardi South Enterprises, Inc.*, No. 14-21244-CIV 2014 WL 5410307 (S.D. Fla. Oct. 23, 2014); *Verma v. 3001 Castor, Inc.*, No. 13-3034, 2014 WL 2957453 (E.D.

Pa. June 30, 2014); *Stevenson v. Great Am. Dream, Inc.*, No. 12-3359, 2013 WL 4217128 (N.D. Ga. Aug. 14, 2013); *Jones v. JGC Dallas LLC*, No. 11-2743, 2012 WL 6928101 (N.D. Tex. Nov. 29, 2012) report and recommendation adopted, No. 11-2743, 2013 WL 271665 (N.D. Tex. Jan. 23, 2013); *Nesselrodte v. Underground Casino & Lounge, LLC*, No. 11-92, 2012 WL 4378163 (N.D. W.Va. Sept. 25, 2012); *Ruffin v. Entm't of the E. Panhandle*, No. 11-19, 2012 WL 761659 (N.D. W.Va. Mar. 7, 2012); *Thompson v. Linda And A., Inc.*, 779 F.Supp.2d 139, 142 (D.D.C. 2011); *Green v. Plantation of Louisiana*, LLC, No. 10-0364, 2010 WL 5256354, at *1 (W.D. La. Nov. 24, 2010), report and recommendation adopted, No. 10-0364, 2010 WL 5256348 (W.D. La. Dec. 15, 2010); *see also Hart v. Rick's Cabaret Int'l, Inc. et al.*, No. 09-3043, 2014 WL 6238175 at *18–23 (S.D.N.Y. Nov. 14, 2014) (denying motions to decertify); *Clincy v. Galardi S. Enterprises, Inc.*, 808 F.Supp.2d 1326, 1337 (N.D. Ga. 2011) (noting that the court had previously granted conditional certification).   The defendant has not specifically directed the Court to any recent, analogous cases where conditional class certification was denied.

### B. <u>Analysis</u>

The plaintiff did not file a motion for conditional class certification at the outset of this litigation, although the complaint made clear that she would be attempting to pursue her claims on behalf of a class.  Instead, she waited to move for class certification until December 17, 2014, a day after she filed her motion for summary judgment and shortly after the close of discovery.  The Court notes that because the defendant did not begin operating until March 2012, potential plaintiffs were not losing claims to the limitations period at the time the motion was filed.  The defendant argues that the Court should

deny the motion as untimely, or, at the very least, require the plaintiff to meet the higher standard that would presumably apply at the "decertification" stage. The defendant maintains that it is unfairly prejudiced by the plaintiff's decision to delay the filing of her motion for class certification because discovery has closed, preventing the defendant from obtaining information needed to move for decertification.

The defendant has not directed the Court to any authority that *requires* the plaintiff to move for conditional class certification early in the case or suggests that the plaintiff has missed some type of hard deadline. And even though the defendant is asking the Court to enforce a previously undeclared deadline by denying the motion outright, it cites no precedent for such a harsh decision. The Court declines the defendant's invitation. Furthermore, the Court assures the defendant that it has the ability to alter the scheduling order and permit class discovery as necessary.

Under both the initial "notice" standard and the "intermediate" standard, the Court easily concludes that the members of the putative class are similarly situated such that class treatment is appropriate. The evidence in the record is more than sufficient to establish the type of similarity that matters in this context – namely that the entertainers were treated in a common or similar manner by the defendant. (*See* Trowbridge Dep. 111:5-19; Miller Dep. 59:2-5, 59:16-60:2; Hargadon Dep. 79:13-23.) The record reveals that they are all classified as independent contractors. None of them are paid wages. They are all subject to the same requirements regarding house fees and use fees for couches, Jacuzzis, and VIP rooms. They are all subject to the same or similar "guidance" and "suggestions" regarding their attire, discouraged behavior, and tip outs. In short, the defendant has a paradigm for how it does business and that paradigm does

not appear to vary in any meaningful way with regard to individual members of the class.

Considering the factors suggested in *Rawls* also makes clear that the plaintiff satisfies the more stringent standard applicable on a motion for decertification. First, defendant has not demonstrated that the putative class members work in "disparate factual and employment settings." As discussed above, the record suggests that the defendant adopted a common approach toward its entertainers that varied little. Second, in light of the Court's summary judgment findings, the defendant does not have defenses that would be meaningfully affected by differences between the defendant's entertainers. For example, differences in the amount of money the entertainers made in tips are not relevant to "offset" defenses because the Court has rejected the defendant's entire legal theory with regard to offsets. Finally, the defendant has not directed the Court to any fairness or procedural problems that the Court finds compelling. Nevertheless, if the defendant subsequently uncovers meaningful differences between class members on the critical issues, the defendant can bring them to the Court's attention with a motion to decertify. This should not, however, be used as opportunity to rehash arguments that the Court has clearly rejected or to draw distinctions that are irrelevant to type of similarity the Court has described above.

### C. Defendant's Arguments Against Conditional Certification

Turning to several specific arguments raised by the defendant in opposition to conditional class certification, the Court finds them to be without merit.

### i.    Mootness

First, the defendant argues that the motion is moot because the defendant is entitled to summary judgment.  The argument is rejected per the Court's ruling above.  Moreover, the Court also discounts those portions of the defendant's other arguments that are premised on defenses or theories that the Court rejected in the summary judgment ruling, for example, the argument that the plaintiff was adequately compensated by the money she made in tips and the defendant is entitled to an offset.

### ii.    Lack of Desire to Opt In

Second, the Court is not convinced that the plaintiff must show that similarly situated individuals desire to opt in at this stage.[8]  Specifically, the Court rejects the suggestion that it should gauge potential interest in the litigation based on how many people have opted in prior to the issuance of court-approved notice.  The purpose of judicially managed notice is to avoid the type of gamesmanship that is prone to occur where the parties are given a free pass to recruit or dissuade putative class members.  *See Hoffmann-La Roche Inc.*, 493 U.S. at 171 (observing that "the potential for misuse of the class device" through "misleading communications" can "be countered by court-authorized notice").  Were the Court to adopt the defendant's position, it would create perverse incentives for similarly situated parties and their counsel to look for ways to convince potential class members to opt-in or indicate opposition to the proposed class prior to receiving court-issued notice, undermining the very purpose of having the Court involved in the first place.

---

[8] To the extent that *Pelczynski v. Orange Lake Country Club, Inc.*, 284 F.R.D. 364 (D.S.C. 2012) suggests otherwise, the Court respectfully disagrees with that case.

### iii.    Need for Individualized Damage Calculations

Third, the Court does not find that the potential need for individualized damage calculations precludes class treatment here. This potential will exist in any FLSA class action,[9] and to the extent that such determinations might be more onerous in this case, that is a product of the defendant's failure to maintain adequate records of its employees' hours, as required by the FLSA. Of course, the defendant attributes its failure to maintain adequate records to its "reasonable belief that Entertainers were Independent Contractors," (ECF No. 80 at 31), a position the Court finds somewhat difficult to accept given the ever increasing number of federal courts that have almost unanimously rejected that argument in very similar situations. At some point, the reasonable step probably would have been to start keeping records in the event that a court rejects your understanding of the law. In any case, the Court declines yet another opportunity to create a perverse incentive by rewarding the defendant for failing to record the hours of its employees.

### iv.    Unsuitable Class Representative

Fourth, the defendant argues that DeGidio is not an acceptable class representative because she is, *inter alia*, an impulsive, unreasonable, vulgar, vindictive, financially irresponsible, drug user who is woefully unaware of the (remote) possibility that she could end up personally responsible for the defendant's costs and legal fees.

---

[9] In the context of Rule 23, which imposes far more rigorous requirements for class certification, the Fourth Circuit has held that the need for individualized determinations on the issue of damages should not ordinarily preclude class certification. *See Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 427-28 (4th Cir. 2003) ("Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification . . . . When such individualized inquiries are necessary, if common questions predominate over individual questions as to liability, courts generally find the predominance standard of Rule 23(b)(3) to be satisfied." (quotation marks and citation omitted)).

(*See* ECF No. 80 at 27-30.)  Although this litany of personal accusations occupies over three pages of the defendant's response, the defendant has not cited a single authority indicating that these factors are appropriate considerations or specifically directed the Court to any case where a proposed class representative has been excluded for such reasons.  While the Court certainly appreciates the defendant's concern for the personal and moral qualifications of the candidate seeking to represent its strippers in this lawsuit, the argument is rejected.

## v.     Arbitration Agreements

Fifth, and most troubling to the Court, are the defendant's claims regarding the effect of an arbitration agreement that allegedly has been signed by all of the entertainers that have worked for the defendant since November of 2014.   The arbitration agreement is contained in a lease that entertainers are now required to sign as a condition of performing at the club.  (*See* ECF No. 80-1 at 7.)  While the lease is mandatory, it contains a form opting out of the arbitration agreement that can be filled out and sent to the defendant's CFO.  (*See id.* at 10.)  The arbitration agreement waives the signatory's right to participate in a class action against the defendant, including any class that may be certified in this case.  (*See id.* at 8.)  The defendant began having its entertainers sign the arbitration agreement more than a year after this action was filed, but one month before the plaintiff moved for class certification.  The defendant argues that the arbitration agreements are enforceable against all entertainers who signed them and preclude their participation in this action.

According to the defendant, every single entertainer who works or has worked for the defendant since November 2014 has signed this agreement, and not a single one

has opted out. (*See* Watson Aff. ¶¶ 4, 6.) The defendant asserts that this demonstrates its entertainers want nothing to do with this lawsuit. The Court can certainly think of less flattering inferences that could be drawn from such remarkable unanimity; however, even assuming that all the entertainers who signed the arbitration clauses believe that they should be classified as independent contractors and want nothing to do with the plaintiff's litigation, their sentiments are really only relevant if they have been given accurate information about the lawsuit and its implications. This is the purpose of judicially managed notice, and it is premature to evaluate the interest in a class action prior to such notice being provided.

The Court does not wish to suggest that the defendant is precluded from communicating with its employees about the case or from presenting them with an arbitration agreement that would apply to future controversies. However, the Court questions the enforceability of the arbitration agreements as they pertain to this action. *See Billingsley v. Citi Trends, Inc.*, 560 Fed. Appx. 914, 919 (11th Cir. 2014) (upholding the district court's refusal to enforce arbitration agreements executed after the filing of an FLSA claim but before class certification where "the timing of the arbitration agreement's rollout was calculated to reduce or eliminate the number of collective action opt-in Plaintiffs" and where the presentation of the agreements was "confusing, misleading, [and] coercive" (quotation marks and citation omitted)). The Court is particularly concerned by statements in the affidavits of employees who signed these agreements that suggest that they may have received inaccurate or incomplete information about the implications of participating in the proposed class. For example:

> I very much prefer to be an independent contractor rather than an
> employee. I like the freedom that I have to work when I want and when I

> can, and to earn as much money as my entertaining skills and abilities allow.  (Decl. of Amy Hensell, ECF No. 80-2 at ¶ 7.)

> As an independent contractor, I like the freedom to come and go as I please and that I do not have to wait for a paycheck.  I do not want my independence interfered with, and I believe other entertainers feel the same way.  (Decl. of Amber Rossin, ECF No. 80-3 at ¶ 9.)

What is troubling about these statements is that they seem to indicate that potential class members have been presented with a false dichotomy.  In other words, the statements imply that a number of the benefits described, a flexible working schedule, ability to keep tips, and ability to take tips home immediately are only available because the entertainers are independent contractors.  Of course, the benefits listed above are not precluded by a finding that the entertainers are employees.

The Court is not accusing the defendant or its counsel of intentional misconduct, but it is concerned that potential class members have been misled about the nature of the plaintiff's claims, the implications of being classified as an employee, and what an employee would need to show to recover under the FLSA.  Indeed, if the defendant has shared with its entertainers the same understanding of its minimum wage obligations that it has shared with the Court, the Court is quite confident that the entertainers have been misled.  The defendant's narrative about the plaintiff throughout this case has been that her purported inability to make money dancing at the Club is a result of the fact that she is a washed up entertainer whose heart is no longer in the business.  If the Club's other dancers have been led to believe that the only dancers who would potentially benefit from this lawsuit are those like the plaintiff who (at least as alleged in some instances) cannot even make minimum wage in tips, it would not be surprising that few entertainers would think it is in their interest to opt in.

Moreover, the Court is concerned that a significant portion of the putative class may believe that they are precluded by the arbitration clauses that they signed from opting into this class action.  Given the possibility that these agreements are not enforceable with regard to this litigation, the Court questions whether some form of corrective instruction is needed advising these potential class members that the arbitration agreement they signed may not be enforceable.  While the Court may ultimately decide that the agreements are enforceable, entertainers who signed the agreements should be permitted to preserve their rights until the issue is resolved.  If the plaintiff believes that such an instruction is needed, she should file a motion proposing a corrective instruction and describing how it should be presented to the putative class.

For the reasons set forth above, the Court grants conditional class certification under section 216(b) of the FLSA.  The defendant's arguments against conditional class certification are rejected for the reasons described above.  The Court is sensitive to the defendant's concern that it will not have an adequate opportunity to conduct discovery with regard to the class, and the Court will consider a reasonable request for additional discovery if necessary.

The Court does not find the defendant's objections to the proposed class notice persuasive, and the requested modifications are irrelevant or unnecessary in light of the Court's Order.  The form of Notice submitted by the plaintiff is approved.  The Notice is hereby ordered to be sent to the following individuals:

> All persons who work or have worked for Defendant Crazy Horse Saloon and Restaurant, Inc., d/b/a Thee New Dollhouse or Thee Dollhouse as entertainers at its location at 3001 Highway 17 South, North Myrtle Beach, South Carolina at any time from March 1, 2012 to the present.

The defendant is ordered to post the Notice in a conspicuous place at its North Myrtle Beach location and to produce the job title, last known mailing addresses, telephone numbers, dates of employment, and the last four digits of the Social Security numbers of all prospective plaintiffs in a computer readable format within fourteen days of entry of this Order. All Plaintiff Consent Forms must be filed with the Court January 15, 2015. If either party objects to this deadline, it shall file a motion with the Court within seven days of this Order. The Court will extend the period for consent forms to be submitted should the defendant fail to timely provide the required contact information.

## CONCLUSION

The Court finds that plaintiff and the other exotic dancers who performed or perform at the Club are properly classified as employees under the FLSA. The plaintiff has submitted sufficient evidence to carry her burden to establish that she was not paid minimum wage and overtime in violation of the FLSA. Conditional class certification is warranted, but the Court declines to certify a class under Rule 23 at this time. For the reasons set forth above:

- the plaintiff's motion for conditional class certification and judicial notice pursuant to section 216(b) of the FLSA (ECF No. 70) is **GRANTED**;

- the plaintiff's motion for class certification under Rule 23 (ECF No. 71) is **DENIED** with leave to refile should the plaintiff survive a motion to dismiss the remaining state law claim or should the defendant fail to file such a motion; and

- the defendant's motion for summary judgment (ECF No. 102) is **DENIED**, except as to the preemption of certain state claims as set forth in this Order.

The proposed class notice submitted by the plaintiff is approved, and the defendant is to promptly comply with the Court's instructions regarding posting the notice and providing the plaintiff with contact information for potential class members.

**IT IS SO ORDERED.**

<u>/s/Bruce Howe Hendricks</u>
United States District Judge

September 30, 2015
Greenville, South Carolina